Zachary R. **FADEM**, Richard Jastremski, Gordon Kaiser, John H. Artrip, John M. Callahan, Richard and Ellen Miller, and Seymour Shapiro, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

FORD MOTOR CO., Jacques Nasser, and Henry D.G. Wallace, Defendants.

No. 02 Civ. 0686(CSH).

United States District Court, S.D. New York.

Jan. 19, 2005.

---

Christopher Lovell, Lovell, Stewart, Halebian, L.L.P., Aaron Lee Brody, Stull, Stull & Brody, Christopher J. Gray, Law Office of Christopher J. Gray, P.C, New York City, for Plaintiff.

Jerome Steven Fortinsky, Shearman & Sterling LLP (New York), New York City, John D. Roesser, Shearman & Sterling LLP, for Defendant.

### MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District Judge.

Plaintiffs are a purported class of shareholders in Ford Motor Company ("Ford") who brought this action against Ford and two of its officers, former President and CEO Jacques Nasser ("Nasser") and former Group Vice President and CFO Henry D.G. Wallace ("Wallace"), alleging that Ford and its officers made fraudulent or misleading statements with respect to

commodities futures activity, in violation of § 10(b) of the Securities Exchange Act of 1934 (the "1934 Act"), Rule 10b–5 promulgated thereunder, and § 20(a) of the 1934 Act.[1]

Plaintiffs filed their original complaint on January 29, 2002. I dismissed plaintiffs' complaint, without prejudice, for failing to meet the heightened pleading standards which the Private Securities Litigation Reform Act ("PSLRA") requires in a securities claim pursuant to the Securities Exchange Act § 10(b). *See Fadem v. Ford Motor Co.,* 2003 WL 22227961 (S.D.N.Y., Sept. 25, 2003) (*"Fadem I "*). I also held that plaintiffs failed to allege fraud with necessary particularity required by Fed.R.Civ.P. 9(b).

On November 11, 2003, plaintiffs filed an amended complaint, praying for the same relief against defendants, and attempting to address the deficiencies in their prior complaint. Defendants again moved to dismiss the complaint on the same grounds. Oral arguments were held on October 28, 2004. For the following reasons, I hold that plaintiffs have again failed to meet the heightened pleading standards that govern a § 10(b) action and dismiss the complaint, with prejudice.

## BACKGROUND

The facts that give rise to this amended complaint have been documented, in part, in the prior opinion on this matter, 2003 WL 22227961, familiarity with which is assumed. Between July 31, 2000 and February 9, 2001, Ford entered into a series of forward contracts to purchase large amounts of palladium—a precious metal automakers use to limit emissions from car engines—at fixed prices. In hindsight, it is clear that this was an unprofitable business decision for Ford. Following Ford's purchases, the price of palladium fell more than 50% off its peak. In addition, following palladium purchase, Ford completed development of a new catalyst design technology which sharply reduced its need for palladium. As a consequence, Ford had possession of a large stockpile of expensive palladium that it had no need for, and was therefore forced to take a write-off in the amount of $953 million, which Ford disclosed to its investors in its 2001 Form 10–K Annual Report.[2]

In their first claim for relief in their amended complaint, plaintiffs allege that defendants "engaged and participated in a continuous course of conduct to conceal adverse material information" about their business operations and future prospects. Am. Compl. ¶ 204. Plaintiffs submit that defendants "(a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon" Ford investors, including plaintiffs. *Id.* at ¶ 206. In the alternative, plaintiffs plead that defendants were "reckless in failing to obtain" and disclose to plaintiffs information regarding adverse material information on Ford's business and operations, and deliberately refrained from taking necessary steps to discover such information. *Id.* at ¶ 207.

In their second claim, plaintiffs allege wrongful conduct on the part of the individual defendants, alleged to be controlling persons of Ford, and liable pursuant to § 20(a) of the Exchange Act.

---

1. The class is described as purchasers of Ford common stock from March 21, 2001 through January 10, 2002. No class has as yet been certified.

2. Dated March 30, 2002, for the fiscal year ended December 31, 2001.

## STANDARDS OF REVIEW

On a motion to dismiss a complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, the trial court's function "is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli*, 616 F.2d 636, 639 (2d Cir.1980); *see Ricciuti v. N.Y.C. Transit Authority*, 941 F.2d 119, 124 (2d Cir.1991). "[T]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The district court should grant a Rule 12(b)(6) motion "only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984) (*citing Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In the case at bar, the motion to dismiss for failure to state a claim must be judged in accordance with the substantive law of civil suits based on violations of § 10(b) and Rule 10b–5.

Except in certain circumstances, consideration of a motion to dismiss the complaint must focus on the allegations contained on the face of the complaint. *See Cortec Industries, Inc. v. Sum Holding, L.P.*, 949 F.2d 42, 47 (2d Cir.1991), *cert. denied*, 503 U.S. 960, 112 S.Ct. 1561, 118 L.Ed.2d 208 (1992); *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 773 (2d Cir.1991). On a motion to dismiss, a district court must accept plaintiff's well-pleaded factual allegations as true, *Papasan v. Allain*, 478 U.S. 265, 283, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986), and the allegations must be "construed favorably to the plaintiff." *LaBounty v. Adler*, 933 F.2d 121, 123 (2d Cir.1991). "[A] Rule 12(b)(6) motion to dismiss need not be granted nor denied in toto but may be granted as to part of a complaint and denied as to the remainder." *Decker v. Massey–Ferguson, Ltd.*, 681 F.2d 111, 115 (2d Cir.1982).

The Court may take judicial notice of public disclosure documents filed with the SEC when considering a Rule 12(b)(6) motion. *See Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir.1991); *In re MetLife Demutualization Litig.*, 156 F.Supp.2d 254, 259 n. 1 (E.D.N.Y.2001). Similarly, the full text of any document quoted or referred to in a complaint, including news articles, may be considered by the Court on a motion to dismiss. *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801, 809 (2d Cir.1996); *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47–48 (2d Cir.1991).

Federal Rule of Civil Procedure 9(b) provides "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Accordingly, a complaint alleging fraud must (1) specify the statements, oral, or written, that the plaintiff contends were fraudulent, either as misrepresentations or containing fraudulent omissions; (2) identify the speaker or the writer; (3) state where, when and to whom the statements were made; and (4) explain why the statements were fraudulent. *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995).

## ANALYSIS

To state a cause of action for securities fraud, plaintiffs must plead the following:

1. Defendants made a false representation or omitted to disclose material information and plaintiff's reliance on defendants' action caused plaintiff injury, AND

2. Plaintiffs must state with particularity facts giving rise to a strong inference that the defendant acted with the required scienter

Part I will address the first requirement, and Part II the second.

## Part I: False Representation or Omission

### A. Standard of Law

To state a cause of action for securities fraud under section 10(b), 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b–5(b), a plaintiff must plead that in connection with the purchase or sale of securities, the defendant, acting with scienter, made a false material representation or omitted to disclose material information, and that plaintiff's reliance on defendants' action caused plaintiff injury. "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b–5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir.2000). With respect to material omissions:

> there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.

*Id.* at 162 (citing cases).

Because materiality is a mixed question of law and fact, the materiality of an omitted or misrepresented fact is resolvable on a motion to dismiss only if the underlying facts are free of controversy, and the fact is so obviously unimportant that no reasonable shareholder could have viewed it as significantly altering the 'total mix' of information made available to the plaintiffs.

Before analyzing the allegations of the amended complaint with respect to misrepresentations, I first review the inadequacies of the original complaint in that regard.

### B. Inadequacies of the Initial Complaint: Misrepresentations

While the reader's familiarity with *Fadem I* is assumed, it will be useful to summarize the pleading inadequacies the Court found in that opinion with respect to false representations or omissions by the defendants.

*Fadem I* noted that "plaintiffs' primary allegation is that by entering into forward purchase contracts for palladium, defendants engaged in speculative activity that subjected the company—and consequently its shareholders—to risk of enormous loss," a risk that defendants failed to disclose to shareholders and investors, thereby committing securities fraud. 2003 WL 22227961, at *3. This charge gives rise to the necessity "to determine whether defendants' activity constituted the virtue of hedging (as defendants contend) or the vice of speculating (as plaintiffs contend)." *Id.* Plaintiffs' allegations in their initial complaint were insufficient because they "fail[ed] to demonstrate that the defendants' actions represented fraudulent behavior rather than mere mismanagement." Stated differently, "[n]othing in the plaintiffs' allegations gives rise to a belief that the defendants' actions represent speculation rather than poor management." *Id.*

As an alternative failure to disclose theory, the plaintiffs asserted "that the defendants entered into future palladium contracts at a time when they knew they would be implementing a new technology that would drastically reduce their palladium needs," so that at that time "Ford was no longer acting as a hedger but a speculator with respect to the palladium commodity." 2003 WL 22227961, at *5. I said in *Fadem I* that "[f]or this theory to succeed, plaintiffs would need to establish that the defendants knew or should have known, *at the time they purchased the palladium*

*contracts*, that the new technology would be implemented at a certain time in the future, so that the defendants' need for the metal was far less than what they actually purchased." *Id.* (emphasis in original). I held that the allegations in the initial complaint were insufficient to sustain this theory, *id.* at *5–7, noting *inter alia* that the complaint "does not attribute to Ford officers or employees the view that the defendants [that is, the company and the individual defendants Nasser and Wallace] were speculating on the price of palladium"; the complaints' reference to plaintiffs' investigations unearthing statements made by unidentified Ford purchasing employees were insufficient, given the Second Circuit rule that sources such as former employees must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." *Id.,* at *7 (citing and quoting *Novak v. Kasaks,* 216 F.3d 300, 313–14 (2d Cir.2000)).

## C. Plaintiff's Allegations in the Amended Complaint

### 1. Alleged misrepresentations

In their amended complaints, plaintiffs allege both that defendants made false representations and omitted to disclose material information to shareholders and investors. With respect to false representations, plaintiffs allege two.

### (a) Ford's promise to use its forward contracts to "offset risk"

 Plaintiffs allege that Ford made a false statement when it stated that it "used commodity forward contracts to offset (i.e., reduce) price risk." Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss ("Plaintiffs' Opposition"), filed May 5, 2004, at 3. In fact, allege plaintiffs, Ford's actions "entailed

substantial risks including increased price risks in respect of price volatile palladium." *Id.* at 10. To assess plaintiffs' allegation, one must begin with the plain text of Ford's disclosures.

In its 1999 Form 10–K Annual Report, Ford stated as follows:

> Ford enters into commodity forward and option contracts. Such contracts are executed to offset Ford's exposure to the potential change in prices mainly for various non-ferrous metals used in the manufacturing of automotive components.

1999 10–K at 51.

Ford's 2000 Report was substantially similar:

> We enter into commodity forward and option contracts. Such contracts are executed to offset our exposure to the potential change in prices mainly for various non-ferrous metals (e.g., aluminum used in the manufacturing of automotive components.)

2000 10–K at 48.

This is precisely what Ford did. It entered into contracts to purchase palladium at a fixed price. Unfortunately for Ford, this ended up being a costly mistake. It contracted to buy palladium at upwards of $1,050 per ounce [3]—historically high prices for the precious metal. Afterwards, the market price for palladium began to decline. Nevertheless, Ford's "exposure" to price *changes* in palladium was indeed "offset" by its forward contracts. Once Ford entered into a contract, the price was fixed.

In their amended complaint, plaintiffs accuse Ford of promising to use forward contracts to "offset (i.e., to reduce or cancel) commodity price risk." Am. Compl. ¶ 4. Plaintiffs then claim that Ford's actions led to "increased price risks in re-

---

**3.** Ford entered a series of contracts as the market price of palladium was rising. At its

peak, Ford purchased palladium for $1,050 an ounce.

spect of price volatile palladium." *Id.* When Ford entered forward contracts to lock in palladium supply at fixed prices, there was no way to be certain whether palladium prices would rise or fall in the future. Nevertheless, Ford's actions led to zero risk of exposure with respect to changes in palladium prices. Ford made no false representation here. As Mr. Baskin, counsel for Ford, noted during oral arguments, Ford was "simply locking in a commodity at a known price, guaranteeing that future price increases would not impact them and future shortages would not impact them." Transcript of Oral Arguments, Oct. 28, 2004 ("Tr.") at 83–84. This was not a false representation.

**(b) Representations made by Martin Inglis**

█ Secondly, plaintiffs assert that Martin Inglis, a "top officer" at Ford, who reported directly to individual defendant Henry Wallace, made a false representation in a speech presented in August 2000 and entitled "SUV Leadership: A Matter of Responsibility." In his speech, Ingliss stated, "we are reducing our costs by switching from palladium to platinum in our catalytic converters. Within the next 12 months, nine vehicle lines will switch from palladium to platinum as we move closer to the natural availability of these metals." [4] According to plaintiffs, since Ford purchased a fixed quantity of palladium at fixed prices, it would be impossible for Ford to reduce costs by switching from palladium to platinum in its catalytic converters.

One difficulty with plaintiffs' allegation is that Ingliss's statement came very early

in Ford's purchasing timeline. Though Ford personnel may have contemplated entering into fixed contracts in the "early part of the year," they didn't actually begin to sign contracts until July 31, 2000. In August 7, 2000, palladium had not yet reached its peak price of $1,050. On the other hand, if Ingliss knew that it was Ford's strategy to enter into aggressive forward contract purchases for the next six months, then his claim that Ford would be reducing costs may have been a false representation. But plaintiffs make no showing of Ingliss's knowledge or intent.

Overall, neither allegation of misrepresentation is strong. Instead of focusing on what was said, plaintiffs' case must instead rest on what defendants did not say.

**2. Allegations of material omissions**

Plaintiffs accuse Ford of failing to disclose to its investors a number of alleged material representations. A material omission of fact would be viewed by "the reasonable investor as having significantly altered the total mix of information made available." *Ganino,* 228 F.3d at 162. While plaintiffs allege a variety of material omissions, they all generally fall under the rubric of Ford's purchase of palladium forward contracts. (Am. Compl. ¶ 34: "Under GAAP and the federal securities laws, Ford was required to disclose these large risks of loss and the risk-increasing use of commodity forward contracts at the start of the Class Period rather than the end of the Class Period.") I discuss each of plaintiffs' allegations in turn, taken from both their brief and amended complaint.

Plaintiffs allege that defendants omitted to disclose the following:

---

4. In their initial complaint, plaintiffs misquoted Inglis as stating that Ford would make the switch "on nine vehicles" rather than "nine vehicle lines." I held that for Ford to make a switch for nine out of approximately 25 vehicles in its fleet "does not represent a drastic anticipated reduction in palladium demand."

2003 WL 22227961, at *6. Plaintiffs' more accurate quotation rectifies that particular problem with their complaint. Nevertheless, for reasons stated in this opinion, it has no effect on the ultimate resolution of defendants' motion.

**(a) Their "objective" or "purpose" in using commodity forward contracts to acquire the ability to take delivery of large amounts of palladium.**

■ According to 17 C.F.R. § 229.305(b), Ford must disclose to its investors certain qualitative information about their risk to exposure in the commodities market. This description "shall include ... a discussion of the objectives, general strategies, and instruments, if any, used to manage those exposures." § 229.305(b)(1)(ii). Likewise the Financial Accounting Standards Board notes that an entity that "holds or issues derivative instruments ... shall disclose its objectives for holding or issuing those instruments, the context needed to understand those objectives, and its strategies for achieving those objectives." FAS 199 ¶ 44. Plaintiffs accuse defendants of failing to disclose their true "objective," which according to plaintiffs was "to acquire the ability to take delivery of large amounts of palladium." Plaintiffs' Opposition at 9.

As noted, Ford repeatedly stated in its prior disclosures that it "enters into commodity forward and option contracts." 1999 10–K, at 51. Plaintiffs fail to provide sufficient evidence that Ford had an obligation to disclose its "objective, purpose and strategy" with any greater degree of specificity to satisfy the requirements of the C.F.R. Plaintiffs cite to no case, nor do I find one in my own research, demonstrating that Ford had a burden, at least in the first instance, to state any more than what it did.

Rather, plaintiffs submit that defendants' earlier disclosure obligation was demonstrated by what Ford in fact disclosed in its 2001 10–K. There, Ford made the following disclosure:

> In addition to these price-hedging activities, our procurement activities ensure that we have adequate supplies of raw materials used in our business. These procurement activities utilize forward purchase contracts, long-term supply contracts and stockpiles. The $1 billion pre-tax write-down of precious metals, discussed in Note 16 of the Notes to our Consolidated Financial Statements, related to these procurement activities. In conjunction with this write-down, we modified our processes so that any price-hedging inherent in our procurement activities is executed by or coordinated with our Treasurer's Office, which manages our price-hedging activity.[5]

---

**5.** Citing Fed.R.Evid. 407 and *Krouner v. American Heritage Fund, Inc.*, 899 F.Supp. 142 (S.D.N.Y.1995), defendants submit that Ford's subsequent disclosures—namely its 2001 10–K—cannot be considered on a motion to dismiss for establishing the inadequacy of prior disclosures. *See* Fed.R.Evid. 407 ("When, after an event, measures are taken ... evidence of the subsequent measures is not admissible to prove negligence or culpable conduct in connection with the event."). Nevertheless, *In re TCW/DW N. Am. Gov't Income Trust Sec. Litig.*, 941 F.Supp. 326, 331 n. 7 (S.D.N.Y.1996) held that post-class period prospectuses may be used by the Court "as a tool to help explain the consequences of ... risk in the context of this lawsuit," even if not "as evidence weighing in the favor of either party."

Furthermore, *In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 73 (2d Cir.2001) noted explicitly that "post-class period data may be relevant to determining what a defendant knew or should have known during the class period." *See id.* at 72, "Any information that sheds light on whether class period statements were false or materially misleading is relevant." Defendants submit that *Scholastic* is inapt, since that case "addresses the use of data from outside the class period, not the sufficiency of disclosure during the class period as measured against post-class disclosure." Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Mar. 24, 2004, at 7 n. 11. That distinction fails to persuade, for two reasons. First, it would appear that the Second Circuit in *Scholastic does* compare the sufficiency of class period disclosure measured against post-class disclo-

This is precisely what plaintiffs contend Ford should have disclosed prior to its 2001 disclosure. *See* Tr. at 62, "[W]e are not complaining about the process modification; we are complaining about the change in the usage of commodity forward contracts and derivatives from an instrument that was used to offset price exposure to an instrument that is used to greatly increase price exposure by buying three years' worth of the commodity at current fixed prices, not hedging."

However, for reasons I discuss further in Part I.B.4 of this opinion, Ford had no obligation to make this disclosure until after it had validated its new palladium saving technology. Therefore, Ford's 2001 10–K disclosures cited above were of no moment with respect to its prior annual reports. Fadem has not established that Ford made material omissions with respect to their "objective," "purpose" or "general strategy."

In oral argument, Mr. Lovell, counsel for plaintiffs, asserted that Ford had the duty to "disclose this risk, that *if* validation happened when they said it would happen, what the market thought was a good fact for Ford . . . could be a huge negative. . . . They just had to disclose what Ford was doing with those contracts, what the consequence and risks were for the company." Tr. 54–55. Perhaps this could be true, if Ford knew, or should have known, while it was purchasing palladium forward contracts, that it would be validating its palladium saving technology at a certain time in the future. This was the critical missing piece of the puzzle that I referred to in my prior opinion. *See* 2003 WL 22227961, at *5. Once again, and for reasons further

developed in Part II.C.2 of this opinion, plaintiffs have failed to establish this proposition.

**(b) Defendants' "strategy" to . . . not hedge commodity forward contracts.**

■ Plaintiffs note that unlike other car companies, notably General Motors, Ford failed to hedge their fixed price contacts through use of such mechanisms as "palladium puts option contracts," "sales of palladium futures contracts" and "other derivative transactions." Am. Compl. ¶ 168. While Ford's alleged failure to hedge provides the foundation for plaintiffs' complaint, plaintiffs' true allegation is that Ford failed to disclose this "strategy" not to hedge their commodity forward contracts.

This allegation fails for the same reason as plaintiffs' prior assertion of material omission. Prior to validation of its palladium saving technology, Ford purchased palladium for use as a raw material. It was only post-validation when Ford's contracts to purchase palladium "got transferred into a hedge," and therefore Ford "had to disclose the consequence of the hedge" at that time. Tr. at 65. Prior to that time, Ford had no obligation discernible in the securities law to disclose any attempts (or lack thereof) at hedging its financial instruments—to "hedge those hedgeable instruments." Am. Comp. ¶ 34. To the contrary, that Ford did not hedge its forward contracts is evidence of the fact that it was not treating the contracts as a hedge at all, but as purchases of raw materials for use in production.

sure. *See Scholastic,* 252 F.3d at 73 ("The $13 million pre-tax special charge taken by Scholastic in February 1997 lends yet more support to the notion that defendants had knowledge of increasing returns."). Second, even if the Court considered post-class data was *not directly relevant to a numbers-to-*

numbers comparison of class data (i.e., using post-class data to provide information about the "aggressive tactics," used by defendants such as "offering excessive discounts," etc., *see id.*), that does not illegitimize the use of post-class data for the more general purpose of evaluating the present motion.

**(c) Defendants' "strategy" to "buy at current fixed prices."**

Finally, plaintiffs argue that Ford failed to disclose to its investors its specific "strategy" to buy palladium at "current fixed prices." Again, to the contrary, Ford disclosed precisely that in its prior annual reports. Moreover, plaintiffs' assertion fails for the same reasons as its first allegation of material omission. Plaintiffs cite no precedent establishing a duty of greater specificity, nor was Ford obligated to treat its forward contracts as hedgeable instruments until after it validated its technology.

For these reasons, plaintiffs have failed to establish any material misrepresentation or omission on the part of Ford.

### 3. *Speculation v. Hedging*

In their original complaint, plaintiffs alleged that Ford made a bet or speculation on the direction of palladium prices when it entered into the forward contracts, an allegation which they raise again, in modified form, in their amended complaint. As previously noted, *Fadem I*, drawing upon a distinction between hedgers and speculators made by the Supreme Court in *Merrill Lynch* [6], held that for plaintiffs' speculation theory to succeed, "plaintiffs would need to establish that the defendants knew or should have known, *at the time they purchased the palladium contracts*, that the new technology would be implemented at a certain time in the future, so that the defendants' need for the metal was far less than what they actually purchased." 2003 WL 22227961, at *5.

It would be nonsensical and contrary to Ford's economic self-interest for the company to purchase more palladium than it knew or thought it would need. Defen-

dants properly point to *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir. 1994) for the proposition that, "[i]n looking for a sufficient allegation of motive, we assume that the defendant is acting in his or her informed economic self-interest," so that if " 'plaintiffs' view of the facts defies economic reason . . . [it] does not yield a reasonable inference of fraudulent intent.' " *Id.*, citing and quoting *Atlantic Gypsum Co. v. Lloyds Int'l Corp.*, 753 F.Supp. 505, 514 (S.D.N.Y.1990).

Conceptually at least, Ford might have continued purchasing large amounts of palladium, knowing its need for supply would be drastically reduced, in hopes that the market price of palladium would continue to rise. Ford could then sell the contracts, or alternatively the palladium itself, for a profit. Given what occurred in the market for palladium, such a strategy would apparently have profited Ford nothing, but that would not make out a case of fraud. *See Shields*, 25 F.3d at 1129 ("misguided optimism is not a cause of action, and does not support an inference of fraud."). But that line of authority need not be further pursued, because plaintiffs do not advance that particular theory of market speculation. Rather, plaintiffs contend that the reason Ford continued purchasing palladium is that "the year 2000 bonuses of Ford purchasing employees and Ford's top executives were increased by Ford's continuing purchase of large amounts of palladium forward contracts after August 2000." Plaintiffs' Opposition at 20–21. Plaintiffs aver that defendants failed to disclose to investors that the individual defendants, Nasser and Wallace, engaged in palladium speculation for that particular purpose.

---

**6.** *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353, 360 n. 10, 102 S.Ct. 1825, 72 L.Ed.2d 182 (1982) ("[W]hen a hedger takes a long or short position that is greater than its interest in the commodity itself, it is to that extent no longer a hedger, but a speculator.").

I consider plaintiffs' bonus theory at length in Part II.D.2 of this opinion. For now, it is sufficient to say that plaintiffs have not alleged either that Ford actually paid Nasser and Wallace bonuses based in any degree upon the company's palladium purchases, or that these defendants' conduct with respect to palladium purchases personally benefited them in any way.

### 4. Allegations of Securities Violations

Finally, plaintiffs raise a number of claims that Ford violated GAAP and SEC reporting and accounting standards. "[A]llegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir.2000) (citations and internal quotation marks omitted).

Plaintiffs allege that Ford committed five separate violations of accounting regulations. I analyze each in turn, beginning with three numbered standards promulgated by the Financial Accounting Standards Board ("FAS").

### (a) FAS No. 107, Disclosures About Fair Value of Financial Instruments

■ FAS No. 107 ¶ 10 states:

An entity shall disclose, either in the body of the financial statements or in the accompanying notes, the fair value of financial instruments for which it is practicable to estimate that value. An entity also shall disclose the method(s) and significant assumptions used to estimate the fair value of financial instruments.

Plaintiffs allege that Ford violated FAS 107 by "failing to include in its 2000 year-end financial statements as well as in the quarterly statements filed during the Class Period the substantial off-balance sheet liability resulting from the mark-to-market loss on Ford's forward purchase commitments." Plaintiffs' Opposition at 23.[7] However, Ford had no loss in palladium to record until it validated the new technology. When it did so, it timely recorded the loss pursuant to FAS 107.

Furthermore, defendants point to *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir.1990), a Seventh Circuit decision, for the following proposition:

For any bad loan the time comes when the debtor's failure is so plain that the loan is written down or written off. No matter when a bank does this, someone may say that it should have acted sooner. If all that is involved is a dispute about the timing of the writeoff, based on estimates of the probability that a particular debtor will pay, we do not have fraud; we may not even have negligence.

*See also Denny v. Barber*, 576 F.2d 465, 470 (2d Cir.1978) ("For the most part, plaintiff has simply seized upon disclosures made in later annual reports and alleged that they should have been made in earlier ones.... [F]ailure to make such perceptions does not constitute fraud.")

Plaintiffs attempt to distinguish *DiLeo* from this present case on the following grounds:

- First, the top two officers of the company in *DiLeo* "had not personally approved unorthodox steps that triggered numerous legally-required disclosures of 'strategy,' 'objective' and risks of derivatives."

---

7. "Mark-to-market" is an accounting method. It involves "[r]ecording the price or value of a security, portfolio or account on a daily basis, to calculate profits and losses or to confirm that margin requirements are being met." Mark-to-market, *at* http://www.investorwords.com/2996/mark to market.html (last visited January 10, 2005).

- Nor were any legally required disclosures made in *DiLeo* "belatedly after the top two officers had been fired and the threat to their jobs from such mandatory disclosure had ended."
- In further contrast to *DiLeo*, "the defendants here also had locked in prior to the Class Period and throughout the Class Period a situation in which the market thought that if two positive developments occurred they would be more positive for Ford; but the defendants internally knew that, if such developments occurred, they would be very negative for Ford."
- *DiLeo* involved "only an accounting firm as to which the plaintiff had failed to plead sufficient facts to show that the accountants should have overridden management's judgment that reserves were adequate."

Plaintiffs' Opposition at 32–33.

These distinctions are not relevant to the case at bar. Defendants did not violate FAS 107 because, in their 2001 10–K, they reported Ford's mark-to-market loss stemming from the forward palladium contracts. Those purchases were not transformed into losses and did not generate an off-balance sheet liability until Ford validated its new technology. Therefore, the timing of the write-down was not fraudulent.

**(b) FAS No. 5, Accounting for Contingencies**

■ FAS No. 5, ¶ 8 states:

An estimated loss from a loss contingency (as defined in paragraph 1) shall be accrued by a charge to income if both of the following conditions are met:

a. Information available prior to issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements. It is implicit in this condition that it must be probable that one or more events will occur confirming the fact of the loss.

b. The amount of loss can be reasonably estimated.

FAS No. 5, ¶ 1 defines "contingency" as "an existing condition, situation, or set of circumstances involving uncertainty as to possible gain (hereinafter a 'gain contingency') or loss (hereinafter a 'loss contingency') to an enterprise that will ultimately be resolved when one or more future events occur or fail to occur."

No. 5, ¶ 10 states:

If no accrual is made for a loss contingency because one or both of the conditions in paragraph 8 are not met, or if an exposure to loss exists in excess of the amount accrued pursuant to the provisions of paragraph 8, disclosure of the contingency shall be made when there is at least a reasonable possibility that a loss or an additional loss may have been incurred. The disclosure shall indicate the nature of the contingency and shall give an estimate of the possible loss or range of loss or state that such an estimate cannot be made.

For example, disclosure shall be made of any loss contingency that meets the condition in paragraph 8(a) but that is not accrued because the amount of loss cannot be reasonably estimated (paragraph 8(b)). Disclosure is also required of some loss contingencies that do not meet the condition in paragraph 8(a)—namely, those contingencies for which there is a reasonable possibility that a loss may have been incurred even though information may not indicate that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements.

Defendants assert that it is FAS 133, considered *infra*, and not FAS 5 that applies, because the issue here involves losses resulting from Ford's forward con-

tracts. Defendants also argue that even if FAS 5 does apply, a company is not expected to accrue a loss contingency unless the amount of liability can be reasonably estimated—which in this case they argue they cannot do. That is, defendants state that since losses or gains are inexorably tied to the market price of palladium (which even plaintiffs concede is "volatile"), the amount of loss could not be reasonably estimated.

Plaintiffs respond that defendants' arguments ignores FAS 5, ¶ 10. That is, even if no accrual needed to be made, there was nevertheless at least a "reasonable possibility" that a loss may have occurred, in which case defendants should at the very least have disclosed the nature of the contingency and provided an estimate of the possible loss.

Regardless of how reasonable the possibility of loss was, plaintiffs fail to address defendants' principal contention that since the contracts at issue were forward contracts, FAS 133, and not FAS 5, governs. Prior cases in which parties have been found to have been in violation of FAS 5 have dealt with straightforward losses of earnings more in line with FAS 5's definition of "loss contingency," and not commodity forward contracts. *See e.g., Rehm v. Eagle Finance Corp.*, 954 F.Supp. 1246 (N.D.Il.1997) (holding defendants in violation of FAS 5 for failing to timely report loss of earnings). I agree with defendants that FAS 133 is the applicable standard.

**(c) FAS No. 133, Accounting for Derivative Instruments and Hedging Activities**

■ FAS 133 is an accounting rule which establishes accounting and reporting standards for derivative instruments (including commodities contracts) and hedging activities. It lays out the conditions that must be met before an entity is allowed to designate a derivative instrument as a hedge, and also establishes when gains and losses must be timely recognized.

FAS 133, ¶ 10 describes contracts which are "not subject to the requirements" of the Rule. One such category of contracts relates to "normal purchases and normal sales," which are defined as

> contracts that provide for the purchase or sale of something other than a financial instrument or derivative instrument that will be delivered in quantities expected to be used or sold by the reporting entity over a reasonable period in the normal course of business.

FAS 138, ¶ 4(a).[8]

Defendants argue that FAS 133 does not apply to Ford's forward contracts for palladium, as those contracts were part of "normal purchases and normal sales." In its 2001 10–K, at FS–17 n. 16, Ford noted that *prior to its validation of its new technology*, all precious metal forward purchase contracts were "previously planned for normal use in production." In its 2000 10–K, at FS–9, n. 1, Ford classified its metals contracts as "held for purposes other than trading," which defendants now interpret to mean held as "normal purchases." Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss ("Defendants' Memorandum"), filed Mar. 24, 2004, at 18.

Plaintiffs respond that "defendants have admitted that such contracts were indeed 'supply hedges' and not 'normal purchases ... that will be delivered in quantities expected to be used by or sold by [Ford] in the normal course of business.'" Plaintiffs' Opposition at 25. Second, plaintiffs assert that Ford admitted that it was "stockpiling" the precious metals. Quoting from Webster's dictionary to define the word

---

8. FAS 138 is an amendment to FAS 133, ¶ 10(b).

"stockpile" ("A supply of goods, raw material, etc., stored up especially in anticipation of future shortage or emergency"), plaintiffs asserts that "stockpiling," in the ordinary sense of the word, is not consistent with the concept of "normal purchases and normal sales." *Id.* Therefore, plaintiffs conclude, Ford's purchase of precious metals here cannot be considered "normal" for accounting purposes.

I disagree. FAS 133 states only that "normal purchase and normal sales" are quantities of a commodity that a company expects to use "over a reasonable period in the normal course of business." The text imposes no artificial deadlines in this regard. Simply because Ford timed its purchases of a necessary supply in one way does not mean that it would be "abnormal" for Ford to decide subsequently upon another schedule. That Ford would want to "stockpile" enough palladium to last for two or three years, rather than one year, in a volatile market is not inherently unreasonable or abnormal, and does not run afoul of the standard declared by FAS 133.

Nor do I find that Ford "admits" its forward purchase contracts were not part of "normal purchases and normal sales." To the contrary, both its 2000 and 2001 reports stated explicitly that they were used for normal use in production.

Plaintiffs would have a stronger argument if they allege and prove that Ford knew, or should have known, that its technological improvement was imminent when it entered into the forward contracts for palladium. If that were the case, plaintiffs could argue that Ford purchased a very large supply of palladium, knowing that the company would not be able to use that quantity during the next two or three years of automobile production. In that circumstance, Ford's purchases of palladium could fairly be regarded as not "normal," thereby implicating FAS 133. But this argument depends on plaintiffs' ability to establish that Ford knew, or should have known, that its technology was about to be validated at the time the company entered into the palladium forward purchase contracts at issue. The amended complaint's allegations are deficient in that regard.

**(d) ARB 43, Timely Write–Offs of Obsolete or Excess Inventory**

■ The Committee on Auditing Procedure of the American Institute of Certified Public Accountants, Accounting Research Bulletin No. 43, Ch. 4, Statement 5 ("ARB 43") provides:

> A departure from the cost basis of pricing the inventory is required when the utility of the goods is no longer as great as its cost. Where there is evidence that the utility of goods, in their disposal in the ordinary course of business, will be less than cost, whether due to physical deterioration, obsolescence, changes in price levels, or other causes, the difference should be recognized as a loss of the current period. This is generally accomplished by stating such goods at a lower level commonly designated as market.

Plaintiffs submit three reasons why Ford should have marked to market its palladium losses prior to 2001: "(1) a known adverse trend at December 31, 2000 that sales were declining; (2) the precipitous steady decline of the price of palladium in the open market, which fell by 50% by July 2001 and kept falling; and (3) an awareness that Ford probably would use less palladium due to technological improvements and also Ford's summer 2001 inquiries about selling its excess palladium." Plaintiffs' Opposition at 26–27.

Neither an adverse trend in sales nor the price of palladium in the open market leads to a duty on the part of Ford to depart from the cost basis of pricing inventory, so long as Ford intended to use the

palladium in its normal production of goods. Plaintiffs' third reason fails because plaintiff has not sufficiently alleged, with the requisite particularity, an awareness on the part of defendants that Ford would use less palladium due to technological improvements, prior to the time when Ford validated its palladium saving technology. For these reasons I decline to find that Ford violated ARB 43.

**(e) Defendants' "Big Bath" Write–Off**

Finally, plaintiffs argue that when defendants finally did write off the $1 billion forward contracts, they "disguised" its significance by joining it together with other large write-offs to make a so-called "big bath" charge. *See IN RE MARRIE,* SEC Release No. ID–191, 2001 WL 1130957, at *71 n. 41 (Sept. 21, 2001) (ALJ Opinion):

> In a "big bath" write-off, a company manipulates its financial statements to make poor results look even worse in a bad year, so as to enhance the next year's earnings. By doing so, new management is able to blame the poor results on previous management.

Plaintiffs' allegation can be dismissed summarily on procedural grounds, because the allegation was not in plaintiffs' amended complaint. It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs. *See In re Livent, Inc. Noteholders Sec. Litig.,* 151 F.Supp.2d 371, 432 (S.D.N.Y.2001) ("The complaint cannot, of course, be amended by the briefs in opposition to a motion to dismiss."); *Lazaro v. Good Samaritan Hosp.,* 54 F.Supp.2d 180, 184 (S.D.N.Y. 1999) ("Furthermore, 'it is axiomatic that the Complaint cannot be amended by the briefs in opposition to a motion to dismiss.' "), *citing O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 229 (S.D.N.Y.1989); *Jacobson v. Peat, Marwick, Mitchell & Co.,* 445 F.Supp. 518, 526 (S.D.N.Y.1977) ("[A] party is not enti-

tled to amend his pleading through statements in his brief.").

For these reasons, I conclude that plaintiffs' amended complaint does not sufficiently plead violations by defendants of applicable accounting standards. But even if the plaintiffs had sufficiently alleged accounting violations or irregularities, that does not make out a case for fraud unless they "are coupled with evidence of corresponding fraudulent intent." *Novak,* 216 F.3d at 309. That brings us to the subject of scienter, to which I now turn.

**Part II: Scienter**

**A. Standard of Law**

The case at bar is governed by the Securities Exchange Act of 1934, as amended by Congress in 1995 by passage of the Private Securities Litigation Reform Act ("PSLRA"). The Second Circuit has said of the PSLRA: "Legislators were apparently motivated in large part by a perceived need to deter strike suits wherein opportunistic private plaintiffs file securities fraud claims of dubious merit in order to exact large settlement recoveries." *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir. 2000) (citation omitted). To curtail the filing of such actions, the PSLRA "imposed stringent procedural requirements on plaintiffs pursuing private securities fraud actions." *Id.*

With respect to scienter, the PSLRA provision particularly pertinent to the instant case is found in 15 U.S.C. § 78u–4(b). That provision requires,

> [i]n any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint *shall,* with respect to each act or omission alleged to violate this chapter, *state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.*

15 U.S.C. § 78u–4(b)(2) (emphasis added). That requisite state of mind in a securities fraud case is "an intent to deceive, manipulate or defraud," *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 168 (2d Cir.2000) (citation and internal quotation marks omitted): "scienter," in legal shorthand.

The Second Circuit regarded *Novak* as requiring it to "determine the impact" of the PSLRA "on the pleading standard for scienter and the required degree of particularity in pleading in this circuit." 216 F.3d at 305. The *Novak* court had no difficulty in summarizing "the pleading standard for scienter that prevailed in this circuit prior to the PSLRA"; it found that standard in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995):

> Plaintiffs must allege facts that give rise to a strong inference of fraudulent intent. The requisite strong inference of fraud may be established either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

cited in *Novak*, 216 F.3d at 307 (internal quotation marks omitted). After a comprehensive analysis, the Second Circuit concluded in *Novak* that § 78u–4(b)(2) "did not change the basic pleading standard for scienter in this circuit." 216 F.3d at 310. The *Novak* court's overall appraisal was that "the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit and no higher (with the exception of the 'with particularity' requirement)." *Id.*[9]

Having found no difference between the PSLRA pleading standard and the previ-ously existing Second Circuit standard, the *Novak* court went on to say:

> Although litigants and lower courts need and should not employ or rely on magic words such as "motive and opportunity," we believe that our prior case law may be helpful in providing guidance as to how the "strong inference" standard may be met.

216 F.3d at 311. The admonition in the first phrase of that sentence is somewhat surprising, since *Acito*, which *Novak* holds up as an exemplar of pre-PSLRA Second Circuit authority, explicitly articulates the "motive and opportunity" analysis. As a seemingly alternative approach, *Novak* instructed district courts, in determining "whether plaintiffs have pleaded facts giving rise to the requisite 'strong inference,'" to consider that

> the inference may arise where the complaint sufficiently alleges that the defendants: (1) benefited in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor.

*Id.* Before leaving *Novak*, it is also worth noting that the Second Circuit approved as "an accurate statement of the law" the district court's holding that "the scienter requirement can be satisfied by pleading either 'conscious recklessness—i.e., a state of mind approximating actual intent, and not merely a heightened form of negligence'—or 'actual intent.'" *Id* at 312.

Although in *Novak* the Second Circuit instructed district courts that they "need

---

9. The last quoted phrase is a reference to another subsection in the PSLRA, 15 U.S.C. § 78u–4(b)(1), which provides that where complaints alleging securities fraud are made on information and belief, "the complaint shall state with particularity all facts upon which that belief is founded." The defendants at bar do not place principal reliance upon that subsection, and I do not find it necessary to consider it further.

and should not employ or rely on magic words such as 'motive and opportunity,'" 216 F.3d at 311, the court of appeals itself in post-*Novak* decisions has continued to employ those very words. *See, e.g., In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir.2001) ("Plaintiffs can plead scienter by (a) alleging facts demonstrating that defendants had both the motive and an opportunity to commit fraud or (b) otherwise alleging facts to show strong circumstantial evidence of defendants' conscious misbehavior or recklessness.") citing *Novak*, 216 F.3d at 307, which in turn cited and quoted *Acito*, 47 F.3d at 52. *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000), offers something of a clarification: "As *Novak* explains, what is required when endeavoring to plead facts supporting a strong inference of scienter by showing motive and opportunity is not a bare invocation of 'magic words such as motive and opportunity,' but an allegation of facts showing the type of particular circumstances that our case law has recognized will render motive and opportunity probative of a strong inference of scienter," citing *Novak*, 216 F.3d at 311.

In evaluating the sufficiency of the allegations in the present plaintiffs' amended complaint on the issue of scienter, I will seek guidance in Second Circuit cases decided both before and after passage of the PSLRA, as *Novak* clearly authorizes me to do. I will analyze the allegations of the amended complaint, first with respect to the defendants' misbehavior or recklessness, and second, with respect to their motive and opportunity. Before undertaking that analysis, however, I first review the inadequacies of the original complaint in alleging scienter.

### B. Inadequacies of the Original Complaint: Scienter

In *Fadem I* I held that plaintiffs had failed to sufficiently allege scienter. *See* 2003 WL 22227961, at *7–*8.

With respect to motive and opportunity as the basis for inferring fraudulent intent, I noted that plaintiffs' scienter claims "focus on the two individual defendants, Nasser and Wallace." *Id* at *7. Plaintiffs did no more than allege that, in connection with the alleged misrepresentations concerning the forward palladium purchases, Nasser and Wallace acted in their economic self-interest and under the pressure of criticism of their job performances at the pertinent times. These allegations were insufficient because "[g]eneral allegations that the defendants acted in their economic self-interest are not enough" to support an inference of fraud, *Ganino*, 228 F.3d at 170." *Id*. I also noted *Ganino's* holding that "undefined or unspecific references to employee pressure are not enough to establish motive." *Id*. The motive component of motive and opportunity analysis "entail[s] concrete benefits that could be realized by one or more of the false statements and and wrongful disclosures alleged," *Shields*, 25 F.3d at 1130.

The allegations of the original complaint were deficient in these respects.

As for conscious misbehavior or recklessness, I noted in *Fadem I* that plaintiffs had not attempted in their original complaint to allege conscious misbehavior on the part of any defendant. 2003 WL 22227961, at *7. Instead, plaintiffs sought to allege that the conduct of Ford or the individual defendants was so reckless that it led to a strong inference of fraud. After reviewing Second Circuit definitions of recklessness as a ground for inferring fraudulent intent, I found the original complaint deficient in this regard, principally because "[i]n order to meet the pleading standards, a complaint must contain more specific allegations of defendants' knowledge of facts or access to information contradicting their public statements than plaintiffs have alleged." *Id.* at *8.

### C. Conscious Misbehavior or Recklessness

#### 1. Analysis of Plaintiffs' Conscious Misbehavior and Recklessness Allegations

Conscious misbehavior is "easily identified since it encompasses deliberate illegal behavior, such as securities trading by insiders privy to undisclosed and material information ... or knowing sale of a company's stock at an unwarranted discount." *Novak*, 216 F.3d at 308. As with the original complaint, plaintiffs' amended complaint does not allege the existence of evidence of either direct or circumstantial evidence that any defendant engaged in conscious misbehavior. Accordingly their allegations of scienter must rely upon recklessness.

In contrast to conscious misbehavior, recklessness is "harder to identify with such precision and consistency." *Id.* In prior cases, the Second Circuit had defined reckless conduct as "at the least, conduct which is 'highly unreasonable' and which represents 'an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.' " *Id., citing Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47 (2d Cir.1978). Later, the Court noted that "an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Novak*, 216 F.3d at 308, *citing Chill v. General Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996).

In securities fraud cases, parties "typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting public statements. Under such circumstances, defendants knew or, more importantly, should have known that they were misrep-resenting material facts related to the corporation." *Novak*, 216 F.3d at 308.

At other times, courts have found recklessness where "plaintiffs alleged facts demonstrating that defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud." *Id.* On the other hand, the *Novak* court said:

> We have refused to allow plaintiffs to proceed with allegations of 'fraud by hindsight.' Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud.

*Id.* at 309 (citations omitted).

Moreover, "as long as the public statements are consistent with reasonably available data, corporate officials need not present an overly gloomy or cautious picture of current performance and future prospects." *Id.* Finally, "allegations of GAAP violations or accounting irregularities, standing alone, are insufficient to state a securities fraud claim. Only where such allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." *Id.*

Reckless conduct represents "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak*, 216 F.3d at 308. Based on this definition, the extent to which plaintiff can establish recklessness hangs on the egregiousness of the misrepresentation or omission. This is precisely why some courts have held that "[w]hen ... information contrary to the alleged misrepresentations is alleged to have been

known by defendants at the time the misrepresentations were made, the falsity and scienter requirements are essentially combined." *In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *7 (E.D.N.Y., Mar. 27, 2001), *citing Rothman v. Gregor,* 220 F.3d 81, 89–90 (2d Cir.2000).

In their amended complaint, plaintiffs allege the existence of "a former Ford employee who worked in the Ford purchasing department from the 1980s until 2001 and was responsible for palladium purchases during the late 1980s and first half of the 1990s." Am. Compl. ¶ 43(a). I will refer to this individual as "the FFE." Plaintiffs allege that the FFE told their investigators [10] that "(1) no person in the purchasing department had the authority to approve such large purchases, and (2) contingent liabilities as big as those in the forward contracts here required multiple levels of approval to at least the Chief Financial Officer and Chief Executive (and possibly the Board of Directors)." *Id.* The amended complaint further alleges that, according to other former financial and purchasing personnel,[11] Ford's large palladium positions were reflected on two separate Ford internal reports—the "WIPS" data tracking system (Worldwide Integrat-

ed Purchasing System) and the "CMMS" (Common Manufacturing Materials System)—which were delivered at least weekly to top executives. Am. Compl. ¶ 18(a). The positions were also reflected in inventory and contingent liability reports prepared at least monthly, to which individual defendants also had access. Am. Compl. ¶ 18(b). Defendant Wallace himself was in charge of financial reporting at Ford, and those who reported to him were responsible for preparing the WIPS and CMMS reports. Am. Compl. ¶ 18(c).

Plaintiffs argue that evidence such as this (assuming that it would be admissible at trial) [12] shows that the individual defendants knew about Ford's palladium positions. They go further and also allege that not only did the individual defendants know about Ford's large palladium positions, they approved them. As evidence of this, plaintiffs point to public reports that Ford's large palladium purchases were approved by "top management." Am. Compl. ¶ 46. *See* Gregory L. White, *How Ford's Cache of Rare Metal has a Huge Write-Off,* The Asian Wall St. J., Feb. 7, 2002, at 1; Tim Burt & Adrienne Roberts, *Ford Counts Cost of Gamble on PGM*

---

10. A footnote to page 1 of the amended complaint states that "[p]laintiffs' allegations are made upon knowledge as to their own acts and upon information and belief as to all other acts and allegations. Plaintiffs' information is based upon, *inter alia,* the investigation made by and through their attorneys," which included "interviews with former employees of Ford . . ."

11. While I have identified plaintiffs' primary former Ford employee witness as "FFE," the amended complaint refers to information furnished to plaintiffs' investigators by other anonymous former employees in Ford's purchasing department.

12. The admissibility of the FFE's testimony might be problematical because he had left Ford's employ before the palladium pur-

chases and validation of technology that underlie the action were made. That is also true of the other anonymous former Ford employees referred to in the amended complaint. *See Fadem I,* 2003 WL 22227961, at * (while Second Circuit case law does not insist "that confidential sources must be named as a general matter," sources such as former employees must be "described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged," *citing Novak,* 216 F.3d at 313–14). Notwithstanding the misgivings that clearly arise with respect to the former Ford employees referred to in the amended complaint, the discussion in text assumes that they could testify at trial in the manner described in the pleading.

*Stock,* Fin. Times, Jan. 22, 2002 (cited in Am. Compl. ¶ 42).

Plaintiffs also rely on the statements of the FFE, who as noted asserts that no person in the purchasing department had the authority to approve such large purchases. Rather, contingent liabilities as large as those in the forward contracts required multiple levels of approval to at least the CFO and CEO (and possibly the Board of Directors). Though the FFE acknowledges having no personal knowledge of who approved Ford's palladium purchases in 2000–01, he claims familiarity with the purchasing organization within Ford, "the structure, the approval process, the normal procedures before large commitments could be made, and other matters." Am. Compl. ¶ 43(a).

The FFE also states that Ford had many controls for purchasing, including "embedded controllers" within the purchasing department. Am. Compl. ¶ 43(b). According to the FFE, the approval process at Ford was "fairly rigorous." Ford purchasing employees were required to examine the forecast of power train combinations that had been tested and were being planned for production to determine projected usage of palladium prior to purchase approval. Am. Compl. ¶ 43(c). Likewise, Ford had "standing cross-functional teams" of purchasing employees and research engineers who communicated with each other on technology changes and their impact on raw materials purchase. Am. Compl. ¶ 47.

Plaintiffs additionally assert that Ford departed from its "vaunted just-in-time" approach to inventory acquisition and towards a strategy to stockpile raw material. This change in approach, according to plaintiffs, makes it more likely that Nasser had given approval to the palladium purchases. Am. Compl. ¶ 46.

Moreover, plaintiffs allege that Nasser was heavily involved in the operations and management decisions of the company. They assert that Nasser failed to install a "number 2 operating officer" as president of Ford North America and instead "flattened out" Ford's management, so that a greater number of people reported directly to him. Plaintiffs allege that these "highly unorthodox" measures indicate a greater likelihood that Nasser approved the purchases. Am. Compl. ¶ 46.

Finally, plaintiffs assert that the "extraordinary size of the positions," in and of themselves, combined with "Ford's regular internal reporting thereof on the WIPS, CMMS, and other regular internal reports" to which Nasser had "constant access," indicate a greater likelihood that Nasser approved the purchases. Am. Comp. ¶ 46.

Responding to this proffered evidence, defendants assert that "nothing in the former employee statements even purports to establish any knowledge of over purchasing by Ford" and that "the statements from these former employees contain very little of substance." Defendants' Brief at 20. Defendants note that the FFE admits to having no "personal knowledge of who approved Ford's palladium purchases in 2000–2001." *Id.* They assert that the FFE"s allegations that Ford had a "high level of controls for purchasing" and a "fairly rigorous" approval process was merely conclusory. *Id.*

Plaintiffs recklessness claim appears to rest on two alternate theories. First, plaintiffs assert that defendants were reckless in not disclosing more information regarding their palladium purchases prior to 2001, as plaintiffs allege defendants were obligated to do, by § 229.305b and other accounting standards. *See* Part I.B.2., *supra.* Plaintiffs argue that this failure to disclose, standing alone, establishes recklessness: "Violations of mandatory disclosure provisions are presumptively materi-

al. . . . Further, they may be indicative of scienter." Plaintiffs' Opposition at 14.

Alternatively, and based largely in part on the testimony of the anonymous former Ford employees, plaintiffs argue that individual defendants Nasser and Wallace both knew of and approved Ford's large palladium purchases. Also, plaintiffs argue that defendants either knew, or should have known, about Ford's impending palladium saving technology—simultaneous to the time Nasser and Wallace approved of the palladium contracts. Therefore, plaintiffs argue, defendants knew, or were reckless in not knowing, that Ford was over-purchasing palladium.

Regarding plaintiffs' first theory of recklessness, for reasons I have stated in Part I.B.2 of this opinion, I am not convinced that Ford violated any mandatory disclosure provisions. Defendants have established that prior to validating the palladium saving technology, Ford used palladium in its inventory in the normal course of production. Therefore the company had no obligation or duty to disclose any "objective" or "strategy" in any more detail than it did, *unless* plaintiffs can point to evidence demonstrating that defendants knew, or should have known, that it would validate its palladium saving technology at a time certain in the future, so as to make the palladium purchases obsolete.

Plaintiffs' second theory of recklessness also hinges on defendants' knowledge of future technology validation. If plaintiffs cannot show that Ford knew, or should have known, that it would be using a palladium saving technology at a time certain in the future, at the time it purchased palladium, then there is no demonstration of recklessness.

In their original complaint, plaintiffs tried to demonstrate defendants' knowledge based in large part on a series of news articles in which various Ford employees made public representations to the effect that a new palladium saving technology may be forthcoming. I held that this was insufficient to establish a well-pleaded securities fraud claim. In their amended complaint, plaintiffs allege the existence of further evidence of defendants' knowledge. Plaintiffs argue, based upon information provided by the FFE, that Ford was "not only aware of such repeated changes in technology but was organizationally set up so as to be able to track technological progress, be aware of when changes would occur, and purchase and otherwise act based upon when such changes would occur." Plaintiffs' Opposition at 18–19.

Based on plaintiffs' new allegations, plaintiffs make a good case for demonstrating that Nasser and Wallace were aware of Ford's palladium purchases. Plaintiffs' evidence may even present strong evidence that Nasser and/or Wallace approved of Ford's palladium purchases. However, this is not enough to establish scienter. Where plaintiffs' evidence fails to meet the heightened pleading standards of Rule 9(b) is in failing to show that simultaneous to the palladium purchases, defendants knew, or should have known, about impending technological breakthroughs. *See Fadem I*, 2003 WL 22227961, at *5 (the articles and other evidence relied upon by plaintiffs in he original complaint "do not establish that the defendants had knowledge, at the time of the palladium purchase, that it would be using palladium reducing technology" at "a certain time in the future.").

The testimony of the former Ford employees demonstrate that Ford had established channels by which employees in purchasing and those in engineering could talk to each other. But the existence of channels is not enough. There is no evidence of what information was actually passed through these channels—what the purchasing and engineering employees actual-

ly said to each other, let alone what information, if any, was conveyed to Nasser or Wallace. One difficulty the former employees may have in this regard is that none of them were actually employed at Ford at the time of the alleged impending technological breakthrough. *See* footnote 12, *supra.* Plaintiffs' primary anonymous witness was employed at Ford through the "first half of the 1990s," six years before Ford validated the technology. It is doubtful, at best, that such a former employee is in a position to predict (he cannot know) what was said or unsaid by whom and to whom with respect to the vital question of when the breakthrough technology would be validated by the Ford engineers. I cannot accept that the existence of an internal communication network, in and of itself, sufficiently supports a theory of scienter based upon reckless conduct in the context of specific information at a specific time.

Plaintiffs' theory may be that the testimony of the former Ford employees, taken together with published news articles and public statements in which Ford representatives make indefinite promises of future technology advancement, is sufficient to establish a strong inference that defendants acted with requisite scienter. However, I find that while at best plaintiffs' evidence arguably demonstrates negligence on the part of Ford, it falls well short of the Second Circuit's standard for scienter through recklessness, which requires "an extreme departure from the standards of ordinary care ... to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Novak,* 216 F.3d at 308 (citations and internal quotation marks omitted) (ellipsis in original).

That insufficiency is made all the more plain by the fact that for every news article plaintiffs allege which speaks of Ford's future technology breakthroughs in terms of certainty, defendants point to other articles in which that prediction is far more guarded. *See, e.g., Auto Companies Vow to Reduce Palladium Use,* Metals Week, Aug. 28, 2000, at 1 (cautioning that "companies will not be able to get rid of palladium entirely" and quoting an analyst as stating, 'You are not going to see anything revolutionary over the short term'); Adam Aljewicz, *Auto Industry Considers Alternative Metals to Palladium,* Dow Jones Int'l News, Feb. 23, 1999 ("[A]ny switch from palladium to other metals will take time ... [due to] 'the high cost of the alternatives.' "); *Id.* (quoting Honda analyst as predicting, "We would have to go through many procedures, which could take many years"). I conclude that plaintiffs' allegations in the amended complaint do not sufficiently allege scienter under the conscious misbehavior and recklessness prongs.

### D. Motive and Opportunity

#### 1. Standards of Law

The Second Circuit describes the motive and opportunity prong of the scienter requirement as follows:

> Motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful non-disclosures alleged. Opportunity would entail the means and likely prospect of achieving concrete benefits by the means alleged.

*Shields,* 25 F.3d at 1130. *See also Novak,* 216 F.3d at 307–08:

> Plaintiffs could not proceed based on motives possessed by virtually all corporate insiders, including: (1) the desire to maintain a high corporate credit rating, or otherwise sustain the appearance of corporate profitability, or of the success of an investment, and (2) the desire to maintain a high stock price in order to

increase executive compensation, or prolong the benefits of holding corporate office. Rather, plaintiffs had to allege that defendants benefited in some concrete and personal way from the purported fraud.

(citations and internal quotation marks omitted).

### 2. Analysis of Plaintiffs' Motive and Opportunity Allegations

 Plaintiffs' allegations of motive and opportunity do not pass muster for the reason that plaintiffs do not sufficiently demonstrate that defendants received concrete benefits from the purported fraud.

Plaintiffs argue that by August 7, 2000 Ford and the individual defendants knew that they were about to implement a breakthrough palladium saving technology. Yet defendants continued to approve purchase of palladium forward contracts for six months more (from August 7, 2000 until February 9, 2001). For what reason, one may ask? Plaintiffs allege that the year 2000 bonuses, for both Ford purchasing employees and Ford's "top executives," were "increased by Ford's continuing purchase of large amounts of palladium forward contracts after August 2000." Plaintiffs' Opposition at 20–21. This is why, according to plaintiffs, the individual defendants speculated on palladium.

According to the FFE, "Ford purchasing personnel had a paper 'mark to market' profit on their purchases." Am. Compl. ¶ 53. According to another former Ford employee (in the financial department), "purchasing employees were evaluated on their materials costs and how much they saved or cost the company." Id. Purchases were evaluated on how much they spent compared to their budget. Finance employees oversaw and "kept a close watch" on the progress of purchasing decisions, calculating savings. Id. Concurrently, the former Ford employees state that the process "was atrocious" and "a very political process inside of Ford." Id.

Plaintiffs also note that "[b]y overbuying in 2000 to increase the year-end price of palladium above the prices that Ford had been paying for palladium earlier in the year, defendants may have increased one component of the bonus ('assets used to run our business and the cost to buy those assets')." Am. Comp. ¶ 54. However, "in the absence of discovery, plaintiffs cannot definitely allege any effect on year 2000 bonuses." Id.

Plaintiffs' theory that the alleged speculation in palladium was related to or motivated by Nasser's and Wallace's desire for enhanced bonuses is itself entirely speculative. The allegations in the amended complaint fail to support it. On the contrary: the amended complaint alleges that "in the first half of 2000" it was unnamed "Ford purchasing department personnel" who recommended that "Ford should depart from its previous practices" and that "Ford should purchase and stockpile large amounts of physical palladium" and that "Ford should purchase large fixed price commodity forward contracts for palladium and take delivery thereon in the upcoming years." Am Comp. ¶ 40. Plaintiffs further allege that "[b]ased on these recommendations, Ford purchased during 2000 and early 2001 supplies of palladium sufficient to meet Ford's needs, based on its current rate of usage of palladium, for the 2000, 2001, and 2002 model years and through the end of calendar year 2002." Am Comp. ¶ 41. These are the palladium purchases that, coinciding with the validation of Ford's new technology, transformed a palladium stockpile into the significant mark-to-market loss of which plaintiffs complain. It is fanciful, indeed highly unlikely, to suppose that the faceless and nameless "Ford purchasing department personnel" who, according to

plaintiffs' own allegations, made these ultimately unfortunate recommendations were motivated in any way by a desire to enhance the bonuses of top executives such as Nasser and Wallace. While plaintiffs also suggest that those Ford employees in the purchasing department had their bonuses tied to palladium purchases, that says nothing with respect to Nasser and Wallace. Nor is there any allegation that Nasser or Wallace participated or intervened the palladium purchasing recommendations and subsequent purchases, or caused non-disclosure of them to investors, in order to "benefit in a concrete and personal way" in the form of increased bonuses. Finally, plaintiffs do not allege the existence of any evidence that any bonus was awarded to any Ford employee based on or influenced by palladium purchases.

The fact that "plaintiffs' view of the facts defies economic reason," *Shields*, 25 F.3d at 1130, also militates against this theory of scienter. It is patently unreasonable to suggest that Nasser or Wallace thought they would enhance their bonuses by participating in these palladium purchases at a time when they knew or should have known "that the new technology would be implemented at a certain time in the future, so that the defendants' need for the metal was far less than what they actually purchased," facts that *Fadem I*, 2003 WL 22227961, at *5, held plaintiffs had to demonstrate. This is a recipe for economic disaster, which in fact came to pass, and is inconsistent with hopes for or expectations of increased bonuses. While plaintiffs also suggest that the Ford employees in the purchasing department had their bonuses tied to palladium purchases, this says nothing with respect to Nassar and Wallace.

The other "concrete benefits" plaintiffs assert are baseless. Plaintiffs allege that "[s]elf-interested motivation of defendants in the form of saving their salaries or jobs may be evidence of scienter," *Aldridge v. A.T. Cross Corp.*, 284 F.3d 72, 83 (1st Cir.2002). Notwithstanding First Circuit precedent, in the Second Circuit, "motives possessed by virtually all corporate insiders, including . . . the desire to . . . prolong the benefits of corporate office," *Novak*, 216 F.3d at 307, cannot be the basis of plaintiffs' scienter claim.

Plaintiffs submit that they do not merely suggest the potential for job loss, but they also plead that the reason Nasser's job was threatened was due to his decision to take "unorthodox steps," such as failing to install a "number 2 operating officer." Am. Compl. ¶ 35(a). These measures are inconsequential since the underlying "motive," i.e., preventing job loss, is not one identified by Second Circuit case law as providing a basis for inferring scienter.

Finally, with respect to the individual defendants Nasser and Wallace, defendants properly point out that "even if it were true that the executives' jobs were in jeopardy, the plaintiff offers no coherent account of how buying excess palladium in the face of an allegedly known decrease in demand would protect their jobs." Defendants' Memorandum of Law in Further Support of Defendants' Motion to Dismiss, filed June 16, 2004, at 9. This is an appropriate reprise of the *Shields* theme of economic unreason.

Plaintiffs cannot establish scienter based on motive and opportunity for the plain reason that they fail to demonstrate a concrete benefit that the alleged fraud would confer upon any defendant resulting from the palladium purchases.

\* \* \*

In Parts I.B. and II.B., *supra*, I summarized the failures of the allegations in plaintiffs' original complaint to state a cognizable claim for securities fraud against any of the defendants. For the foregoing

reasons, I conclude that plaintiffs' amended complaint, while greater in quantity, is no better in quality. Accordingly the amended complaint will be dismissed, this time without leave to amend.

### Part III: Control Person Liability

The plaintiffs assert a claim under § 20(a) of the Exchange Act against defendants Nasser and Wallace. To establish a claim under § 20(a), a plaintiff must establish "(1) a primary violation of the 1934 Act, (2) scienter, and (3) control of the primary violator by the defendants." *In re 1993 Corning Sec. Litig.*, 93 Civ. 7015, 1996 WL 257603, at *8, 1996 U.S. Dist. LEXIS 6601, at *26 (S.D.N.Y. May 15, 1996). Since for the reasons stated above plaintiffs have again failed to plead facts from which findings of a violation or a defendant's scienter could be made, their claim under § 20(a) will be dismissed as well.

### CONCLUSION

For the reasons expressed in this opinion, defendants' motion to dismiss plaintiffs' amended complaint is granted.

The Clerk of the Court is directed to dismiss the amended complaint in its entirety, without further leave to amend.

It is SO ORDERED.