Carl M. **HESSEL**, a Swiss Citizen, Plaintiff,

v.

**CHRISTIE'S INC.**, a New York corporation; and John Does 1–5, Defendants.

No. 05 Civ. 9277(VM).

United States District Court, S.D. New York.

Nov. 10, 2005.

Anthony Andrew Lopresti, Meltzer Lopresti, LLP, New York, NY, Stanley C. Morris, Corrigan & Morris, Los Angeles, CA, for plaintiff.

## DECISION AND ORDER

MARRERO, District Judge.

Plaintiff Carl M. Hessel ("Hessel") seeks a preliminary injunction restraining and enjoining Christie's Inc. and John Does 1–5 [1] (collectively, "Christie's") from (1) selling at auction on November 8, 2005 or otherwise, a painting by Jeff Koons, titled "Saint Benedict" (the "Koons"); (2) selling at auction on November 8, 2005 [2] or otherwise, a painting by Jean Michel Basquiat, titled "The Whole Livery Line" (the "Basquiat"); and (3) selling at auction or otherwise an untitled painting by Damian Hirst (the "Hirst") delivered by Hessel as collateral. (Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, dated Nov. 1, 2005 ("Order to Show Cause"), at 2.) In the underlying complaint, filed concurrently with the Order to Show Cause, Hessel alleges that the parties entered into an oral contract for Hessel to purchase the Koons and Basquiat based on his successful bid for these paintings at an auction on May 11 and 12, 2004, but that a dispute has arisen over the contract's terms, including ownership, time remaining for payment, interest rate, storage fees and remedies available for breach of the oral contract, such as what Christie's may do with the Hirst painting that Hessel pledged as collateral. The underlying complaint requests that the Court issue declaratory and injunctive relief defining the rights of the parties under the contract. By Order to Show Cause, Hessel seeks a preliminary injunction to prevent Christie's from proceeding with the auction of the paintings on November 8–9, 2005 before the Court can resolve the dispute. (Pl. Mem. at 2.). On November 7, 2005, the Court heard oral argument on Hessel's motion and ruled from the bench to deny the injunctive relief requested.

A review of the parties' pleadings and submissions reveals that Hessel is unlikely to demonstrate success on the merits, nor is the irreparable harm as great as Hessel claims. Moreover, the balance of hardships does not tip decisively in Hessel's favor. For the reasons stated at the oral argument and elaborated below, Hessel's request for a preliminary injunction is denied.

## I.  BACKGROUND

### A.  FACTS

On May 11 and 12, 2004, Christie's conducted an auction of Post–War and Contemporary Art. (Declaration of Jennifer Zatorski, dated Nov. 4, 2005 ("Zatorski Aff."), at 2 ¶ 4.) On May 11, Hessel placed a bid of $1.5 million by telephone on the Koons painting, and on May 12, he placed

---

1.  Plaintiff alleges that John Does 1–5 are other agents or employees of Christie's, affiliates, subsidiaries or parent companies of Christie's and/or other persons who claim title, ownership and/or commissions in and to the property at issue. (Verified Complaint of Carl M. Hessel for Accounting; Declaratory and Injunctive Relief, dated October 31, 2005 ("Compl."), at 3 ¶ 7.)

2.  In the Order to Show Cause, Hessel requested that Christie's be enjoined from selling the Basquiat at auction on November 8, 2004. (See Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, dated Nov. 1, 2005, at 2). Since November 8, 2004 has already passed, the Court should assume that Hessel is requesting an injunction against selling the Basquiat at auction on November 8, 2005.

a bid of $600,000 on the Basquiat painting. (Affirmation of Carl Hessel in Support of Application for Restraining Order and Other Relief, dated Oct. 31, 2005 ("Hessel Aff."), at 2 ¶ 3.) Hessel was the highest bidder for both paintings. (Zatorski Aff. at 3 ¶ 7.)

Hessel alleges that prior to the auction, he reviewed Christie's website and saw only descriptions of the paintings and estimates of their value. (Hessel Aff. at 1–2 ¶ 2.) According to Hessel, the website contained no terms or conditions of sale. (Hessel Aff. at 1 ¶ 2.) Prior to the auction, Hessel also contacted Christie's by telephone to inquire about bidding by telephone and was told how to bid by telephone, but was not informed of any terms or conditions of sale. (Verified Complaint of Carl M. Hessel for Accounting; Declaratory and Injunctive Relief, dated Oct. 31, 2005 ("Compl."), at 3 ¶ 10.) Hessel also alleges that when he placed his bids by telephone, no terms or conditions were mentioned to him. (Hessel Aff. at 2 ¶ 2.)

Christie's, however, alleges that its website did contain terms and conditions governing the auction. According to Jennifer Zatorski, Business Director and Senior Vice President, Impressionist, 20th Century and Contemporary Art at Christie's ("Zatorski"), the lower left-hand corner of the web pages that contained the descriptions of the Koons and the Basquiat had the words "Important Notice." (Zatorski Aff. at 2 ¶ 6.) When a viewer clicks on the words "Important Notice," a notice appears, stating, among other things, that "All terms and conditions relating to the auction at which any property is offered for sale, as well as information about how to bid, are set forth in the catalogue for the auction at which the property is of-

fered. The catalogue for the auction at which the property is offered supercedes anything presented here. It is your responsibility to check the catalogue in advance of the sale to inform yourself of the terms applicable to the sale." (Zatorski Aff. at 2 ¶ 6.) The full text of the "Important Notice" is attached to the Zatorski Affidavit. (*See* Important Notice, Ex. 3 to Zatorski Aff.)

The printed catalogues for the Koons and Basquiat auction contained a section called "Conditions of Sale." (*See* Excerpt from Post–War and Contemporary Art catalogue, dated May 11, 2004, pp. 208–209 ("Conditions of Sale"), attached as Ex. 1 to Zatorksi Aff.) [3] The Conditions of Sale contain various terms governing contracts between Christie's and auction buyers. Among other terms, the Conditions of Sale provide that:

1. the Conditions of Sale contain all terms on which Christie's and the seller contract with the buyer (*See* Conditions of Sale, first para.);

2. by bidding at auction the buyer agrees to be bound by these terms (*See* Conditions of Sale, first para.);

3. subject to the auctioneer's discretion, the highest bidder accepted by the auctioneer will be the buyer and the striking of his hammer marks the acceptance of the highest bid and the conclusion of a contract for sale between the seller and the buyer (*See* Conditions of Sale, 3(j));

4. the buyer agrees to pay the buyer's premium (a commission) in addition to the bid price (*See* Conditions of Sale, 4(a));

5. the buyer does not acquire title to the lot until all amounts due are re-

---

**3.** The May 11, 2004 catalogue contained information on the Koons painting. The May 12, 2004 catalogue, which contained information on the Basquiat painting, has the same

Conditions of Sale. (*See* Excerpt from Post–War and Contemporary Art catalogue, dated May 12, 2004, attached as Ex. 2 to Zatorski Aff.)

ceived in good cleared funds (*See* Conditions of Sale, 4(b));

6. the buyer must pay the full amount due no later than 4:30 p.m. on the seventh calendar day following the sale (*See* Conditions of Sale, 4(b));

7. Christie's remedies if the buyer fails to make payment in full within seven calendar days following the sale include but are not limited to:

(a) charging interest at such rate as Christie's reasonably decides,

(b) canceling the sale,

(c) reselling the property on such terms as Christie's thinks fit,

(d) where several amounts are owed by the buyer on different transactions, applying any amount paid to discharge any amount owed from any particular transaction, and

(e) exercising all rights and remedies of a person holding security over property owned by the buyer to the fullest extent permitted by the law of the place where such property is located and retaining such property as collateral for the buyer's obligations (*See* Conditions of Sale at 4(f)); and

8. if Christie's resells the property as a remedy for the buyer's breach, then the defaulting buyer is liable for any deficiency as wells as all costs, expenses, damages, legal fees and commissions and premiums associated with both sales or otherwise arising from the default (*See* Conditions of Sale at 4(f)).

Hessel alleges that at the time he bid for the Koons and Basquiat paintings, he had over $1 million in cash and "believed" he had securities worth more than $2 million that he would liquidate to pay for the paintings if he were the successful bidder.

(Compl. at 4 ¶ 16.) However, Hessel alleges that he "later" discovered that the securities he intended to liquidate to pay for the paintings could not be liquidated, "due to the issuer's unexpected failure to comply with the United States Securities Laws." (Compl. at 4 ¶ 16.) [4] He described himself as "in the difficult position of having successfully purchased paintings that he desperately still wanted to own, but without the immediate cash resources necessary to pay for them." (*Id.*)

Hessel alleges that he first received invoices for the Koons and the Basquiat on June 8, 2004. (Compl. at 4 ¶ 13.) Christie's contends that the invoices were issued earlier—approximately three business days after the auction—and were again sent to Hessel on June 8, 2004. (Zatorski Aff. at 3 ¶ 8–9.) The invoices indicated a total purchase price of $1,687,500 for the Koons and $679,500 for the Basquiat. (*See* Invoices dated May 11, 2004 and May 12, 2004 ("Invoices"), attached as Ex. 1 to Hessel Aff.) The invoices indicated that the purchase price was the sum of the final bid price plus a premium, as set forth in the Conditions of Sale. (*See* Invoices, attached as Ex. 1 to Hessel Aff.) The Koons invoice was dated May 11, 2004 and stated that payment was due May 18, 2004; the Basquiat invoice was dated May 12, 2004 and stated that payment was due May 19, 2004. (*See* Invoices, attached as Ex. 1 to Hessel Aff.) The cover letter accompanying the June 8, 2004 issuance of the invoices noted that the invoices were past due. (*See* Cover Letter dated June 8, 2004, attached as Ex. 1 to Hessel Aff.) The invoices stated that they were subject to the Conditions of Sale set forth in the auction catalogue, that lots remaining on Christie's premises for more than seven days following a sale will incur storage charges, that Christie's may

---

4. Exactly when he discovered that he did not have the resources to pay for the paintings is not clear.

impose a 1.34% late charge[5] per month if the buyer does not make payment in full in accordance with the Conditions of Sale, and that title to the property does not pass to the buyer until Christie's has collected payment in full from the buyer. (*See* Invoices, attached as Ex. 1 to Hessel Aff.)

From June through July 2004, Hessel sent Christie's funds totaling $1,003,750. (Compl. at 5 ¶ 18.) In June 2004, Hessel asked his "personal friend" Oliver Gelmini ("Gelmini") to assist him in "working out the terms of an acceptable postponement of Hessel's payment obligations to Christie's." (Compl. at 5 ¶ 19.) According to Hessel, Christie's advised Gelmini that Hessel could have more time to pay off the balance. (Compl. at 5 ¶ 19). No further payments were made that year. (*See* Account Statement dated November 3, 2005 ("Account Statement"), attached to Zatorski Aff. as Ex. 19.)

In October 2004, Christie's requested that Hessel send the Hirst painting as collateral, as well as $500,000 in funds wired to Christie's account. (Zatorski Aff. at 4 ¶ 12.) On October 29, 2004, Christie's acknowledged that it received the Hirst painting but had not yet received the $500,000. (*See* Email from Brett Gorvy to Oliver Gelmini, dated Oct. 29, 2004 ("Oct. 29, 2004 Email"), attached as Ex. 8 to Zatorski Aff.) Christie's stated that if it did not receive the $500,000 by October 31, 2004, it would be forced to sell the Koons privately. (*See id.*)

In the Oct. 29, 2004 email, Christie's also reminded Hessel of the accruing interest and attached an account statement. (*See id.*) Hessel contends that this was the first time Christie's ever attempted to impose interest. (*See* Hessel Aff. at 4 ¶ 11.) In contrast, Christie's alleges that, consistent with its Conditions of Sale and its standard practice, it began assessing default interest on the balance owed by Hessel starting seven days after the auctions, at a rate of 16% per annum. (Zatorski Aff. at 3 ¶ 10.) According to Christie's, the 16% rate takes into account that the purchaser is in default, and that Christie's "does not willingly or knowingly take on the credit risk of purchasers who fail to pay." (Zatorski Aff. at 3–4 ¶ 10.)[6]

On November 12, 2004, Christie's emailed Gelmini and stated that it had received no response to its October 29 email, that it had not received the $500,000, and that unless it received the $500,000 by November 19, it would sell the Koons and Basquiat. (*See* Email from Jacqueline Tran On Behalf of Brett Gorvy to Oliver Gelmini, dated Nov. 12, 2004, attached as Ex. 3 to Hessel Aff.). On November 15, 2004, Gelmini informed Christie's that Hessel would pay in full at the "very beginning of December." (*See* Email from Oliver Gelmini to Brett Gorvy, dated Nov. 15, 2004, attached as Ex. 9 to Zatorksi Aff.) However, when Christie's asked for a precise payment date, Gelmini replied on November 24 that the money would not be available in December after all, that he "can't promise that money will come at a precise date," and authorized Christie's to sell the Koons by stating: "I believe that I have no other choice than to tell you that . . . we have to arrange for a private sell [sic] of the Koons." (*See* Email Correspondence between Brett Gorvy and Oliver Gelmini, dated Nov. 22–24, 2004, attached as Ex. 9 to Hessel Aff.)

---

5. The Conditions of Sale state that Christie is entitled to charge interest at such rate as it shall reasonably decide, but do not use the term "late charge." (*See* Conditions of Sale, 4(f)(i).)

6. Hessel alleges that Christie's charged interest on the entire purchase price, including the paid portion. (Compl. at 6 ¶ 22.). However, a preliminary review of the interest statement reveals that this claim is probably incorrect. (*See* Ex. 19 to Zatorski Aff.)

In a November 25, 2004 email to Christie's, Gelmini then said that he was "sorry to give you such an answer," that he could not promise when the money would be available, but that his "best shot" would be January 27 and February 10, 2005. The email also stated, "If you agree to wait and if we can keep interest rates low, we can maybe send small amounts throughout this time." (*See* Email from Oliver Gelmini to Brett Gorvy, dated Nov. 25, 2004, attached as Ex. 8 to Affirmation of Oliver Gelmini in Support of Application for Temporary Restraining Order and Other Relief, dated Oct. 27, 2005 ("Gelmini Aff.").)

Hessel alleges that he "assumed" that Christie's "agreed to [his] offer by lowering its interest rate and postpone [sic] their collection actions, as a result of Mr. Gelmini's correspondence." (*See* Hessel Aff. at 6 ¶¶ 17–18). He states between March 4 and March 31, 2005, "in reliance on" this agreement, he sent an additional total of $195,000 to Christie's. (*See* Hessel Aff. at 6 ¶ 18.) Prior to sending this money, however, several events happened. First, Zatorski alleges that in December 2004 she met with Hessel, who stated that he could not pay until the end of February 2005. (*Se* Zatorksi Aff. at 5 ¶ 15.). Second, on January 3, 2005, Christie's sent Hessel a letter stating that it was "formal notice" that Hessel was in default of his obligations to pay the full purchase price under the Conditions of Sale and that it was a "formal demand" for payment of all amounts due as set forth on the attached spreadsheet, by January 26, 2005 or else Christie's would exercise its rights. (*See* Zatorski Aff. at 5 ¶ 18; Letter to Carl Hessel from Christie's, dated Jan. 3, 2005, attached as Ex. 10 to Zatorski Aff.).

Third, on February 25, 2005, Christie's sent another letter to Hessel stating that it had not received full payment as required by the Conditions of Sale, that the letter constituted "final notice" to Hessel that he was in default of his obligations and that if full payment was not received by March 7, 2005 Christie's would exercise its rights. (*See* Zatorski Aff. at 5 ¶ 18; Letter to Carl Hessel from Christie's, dated Feb. 25, 2005, attached as Ex. 11 to Zatorski Aff.) [7]

From March 4 to March 31, 2005, Hessel made additional payments totaling $195,000. (*See* Hessel Aff. at 6 ¶ 18; "Account Statement" attached to Zatorski Aff. as Ex. 19.) No further payments were made.

Hessel alleges that he had no further contact with Christie's until September 2, 2005, when he received an email informing him that because he had not made full payment, Christie's intended to sell both the Koons and Basquiat at auction on November 8 and 9, 2005. (*See* Hessel Aff. at 7 ¶ 21; Email from Jennifer Zatorski to Oliver Gelmini, dated Sept. 2, 2005, attached as Ex. 9 to Hessel Aff.)

On September 15, 2005, an attorney for Hessel from the law firm of Dagon & Partners in Switzerland ("Dagon") sent a letter to Christie's purporting to be an "injunction" to not sell the paintings and stating that Hessel was willing to pay another advance of $300,000 before the end of September and "pay off his debt before the first auction in New York 2006." (*See* Letter from Dagon & Partners to Christie's, dated Sept. 15, 2005, attached as Ex. 13 to Zatorski Aff.) On September 19, Dagon sent another letter, addressed to Zatorksi, which acknowledged that Hessel was in default [8] but asking Christie's to

---

7. Christie's states that the February 25, 2005 letter was sent by both email and registered mail, but that the registered letter was returned by the post office. (*See* Zatorski Aff. at 6 ¶ 18 n. 1)

8. The letter stated, "Yes, my client is in default...." (Letter from Dagon & Partners to Zatorski, dated Sept. 19, 2005, attached as Ex. 14 to Zatorski Aff.)

wait six more months and not sell the paintings. (*See* Letter from Dagon & Partners to Zatorski, dated Sept. 19, 2005, attached as Ex. 14 to Zatorski Aff.) The letter also stated that Hessel should have a choice as to which painting was sold because he had already paid enough to cover the Basquiat. (*See id.*)

On September 19, 2005, Christie's replied to Dagon. (*See* Letter from Lee White Galvis, Deputy General Counsel at Christie's, to Dagon, dated Sept. 19, 2005, attached as Ex. 16 to Zatorski Aff.). Christie's pointed out the clause in the Conditions of Sale that allowed Christie's to apply payments to Hessel's multiple accounts at Christie's discretion. Christie's also stated that it was willing to withdraw the paintings from auction if Hessel made full payment by September 23, 2005. (*Id.*)

No further payments were made, so Christie's arranged for the sale of the Koons and Basquiat. (*See* Zatorski Aff. at 7 ¶ 2.)

On November 1, 2005, Hessel filed a motion for an Order to Show Cause requesting that Christie's be restrained from selling the Koons and Basquiat at the November 8–9 auction, and that Christie's be restrained from selling the Hirst as well. (*See* Order to Show Cause). Hessel's motion was filed simultaneously with a complaint demanding an accounting, as well as declaratory and injunctive relief. (*See* Compl.)

Hessel claims that he will be able to lawfully liquidate certain securities by March 31, 2006, and at that time he will do so and use the proceeds to satisfy his obligations to Christie's. (Hessel Aff. at 8 ¶ 28; Compl. at 7 ¶ 27). Hessel contends that he never agreed to the 1.34% late charge (*See* Compl. at 4 ¶ 17), never

agreed to the 16% interest charge (*See* Compl. at 12 ¶ 48(c)); and that no documents were ever exchanged at or before the auction detailing any terms of the contract other than the purchase price and the artwork that was being purchased (*See* Hessel Aff. at 9 ¶ 30).

In the underlying complaint, Hessel asks the Court to declare that (1) Hessel owns the Koons and Basquiat (Compl. at 13 ¶ 50(a)); (2) Hessel should pay "the remainder of the purchase price, $1,168,000, only," to Christie's "in full and final satisfaction" of his obligations (Compl. at 14 ¶ 50(b)); (3) Christie's may not sell either the Koons or the Basquiat unless Hessel fails to pay on or by March 31, 2006 [9] (Compl. at 14 ¶ 50(c)); and (4) if Hessel has not performed in accordance with the Court's instructions after March 31, 2006, Christie's may sell only the Koons, and use the proceeds thereof, without additional commissions, to pay the balance of the purchase price, with all excess funds to be paid to Hessel, along with the Basquiat and Hirst (Compl. at) (Compl. at 14 ¶ 50(d)).

Hessel also requests that the Court enjoin Christie's from selling the Koons, Basquiat or Hirst until March 31, 2006, and thereafter enjoin Christie's to deliver and release such art pieces to Hessel immediately upon payment by Hessel to Christie's of $1,168,000 on or before March 31, 2006 (Compl. at 15 ¶ 59).

## II. DISCUSSION

### A. STANDARD OF REVIEW

"A party seeking a preliminary injunction must demonstrate '(1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions

---

9. The Complaint says March 31, *2005;* this is most likely a typographical error and the Court assumes that Plaintiff means March 31, *2006.*

going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." ' *MyWebGrocer, L.L.C. v. Hometown Info., Inc.*, 375 F.3d 190, 192 (2d Cir.2004) (quoting *Merkos L'inyonei Chinuch, Inc. v. Otsar Sifrei Lubavitch, Inc.*, 312 F.3d 94, 96 (2d Cir.2002)).

## B. *LIKELIHOOD OF SUCCESS ON THE MERITS*

In order to assess the merits of Hessel's claims, the Court must determine what are the terms of the contract that apply to Hessel's purchase of the Koons and the Basquiat from Christie's. The main dispute is whether the Conditions of Sale printed in Christie's auction catalogue apply to Hessel's bids for the Koons and the Basquiat. Hessel contends that they do not; Christie's maintains that they do. If the Conditions of Sale do govern Hessel's bids, then Hessel's chance of succeeding on the merits is greatly diminished, because the Conditions of Sale largely resolve the dispute in Christie's favor. The Court finds that the Conditions of Sale do apply, and thus that Hessel is not likely to succeed on the merits.

In any event, even if the Conditions of Sale do not apply to the contract between Hessel and Christie's, Hessel is unlikely to succeed on the merits. The New York Uniform Commercial Code ("U.C.C."), which governs sale by auction, provides that Christie's may cancel and resell if the buyer is in breach. It is likely that the Court would find a breach based on Hessel's nonpayment for 18 months. Moreover, there is no clear evidence that Christie's agreed to modify the terms of the contract or waive any of its rights.

### 1. *Whether the Conditions of Sale Apply to Hessel's Bids*

The Conditions of Sale state that "[b]y bidding at auction you agree to be bound by these terms." (Conditions of Sale para. 1, attached as Ex. 1 to Zatorski Decl.) The Conditions of Sale also state that they contain "all the terms on which Christie's and the seller contract with the buyer." (*Id.*) Hessel, however, contends that no such terms were posted on Christie's website when he viewed the description of the Koons and Basquiat (Hessel Aff. at 1 ¶ 2),[10] and that no such terms were mentioned to him by telephone either prior to or at the time of his bid (*Id.*). Hessel in essence argues that because he did not see these terms on Christie's website (or because the terms were not posted), nor were they mentioned by telephone, no such terms apply to his agreement with Christie's, and that the parties instead have only an oral contract, whose ambiguities the Court must define. (*See* Pl. Mem. at 3 ("A dispute has arisen ... regarding the terms of that oral contract.").)

In contrast, Christie's argues that by placing a bid in an auction, the bidder consents to be bound by the terms in the catalogue governing the auction, even if the bid was by telephone, and even if the bidder did not read the terms in the catalogue. (*See* Defendant Christie's Inc.'s Memorandum of Law in Opposition to Plaintiff's Application for Temporary Restraining Order and Preliminary Injunction, dated Nov. 4, 2005 ("Def.Mem."), at 10–11.) The Court agrees.

Courts in this District have held that by placing a bid in an auction, the bidder "consent[s] to be bound by the terms in the catalog governing the auction." *Csaky v. Meyer*, No. 94 Civ. 8117, 1995 WL

---

**10.** In his Affirmation, Hessel alleges that no such terms were posted on Christie's website (Hessel Aff. at 1 ¶ 2); however, in his Complaint, he merely alleges that he did not *see* any such terms on the website (Compl. at 3 ¶ 9).

494574, at *1 (S.D.N.Y. Aug.18, 1995). Admittedly, the cases in which this Court and New York state courts have so held are factually distinguishable, in that the bidders in those cases had clearly received copies of the auction catalogues containing the conditions governing the auction prior to bidding, whereas here Hessel alleges that he had not received such catalogues. *See T.T. Exclusive Cars, Inc. v. Christie's, Inc.*, No. 96 Civ. 1650, 1996 WL 737204, at *2 (S.D.N.Y. Dec.26, 1996); *Csaky*, 1995 WL 494574, at *1; *Giusti v. Sotheby Parke Bernet Inc.*, N.Y.L.J. July 16, 1982, at 5 (Sup.Ct. N.Y. County 1982) (attached to Def. Mem.) ("[Plaintiff] had received this catalogue some time before leaving Italy [and before the bid.]").

This dispute raises a factual issue ultimately to be resolved at trial on the merits. If Hessel did receive the auction catalogue containing the Conditions of Sale, he is responsible for the contents, even if he did not read the document. *See, e.g., Giusti*, N.Y.L.J. July 16, 1982, at 5 ("The fact that Giusti neither read this notice in the catalogue nor the 'as is' disclaimer posted throughout the gallery on the conditions of sale signs, does not in the least diminish the force of the disclaimers.... He is bound by the terms of the sale and the limitations clearly imposed thereon and his claimed lack of actual knowledge of them '... through negligence or inexcusable trustfulness' will not relieve him of his contract." ") (quoting *Metzger v. Aetna Ins.*

*Co.*, 227 N.Y. 411, 416, 125 N.E. 814 (1920)).

■ Nonetheless, at this stage of the proceedings, the Court is not persuaded that Hessel has sufficiently demonstrated a likelihood of success on the merits. Christie's contends that Christie's web pages Hessel viewed prior to bidding in the auction contained an "Important Notice" which, if clicked on, stated that all bids were subject to the Conditions of Sale and that it was the bidder's responsibility to check the catalogue in advance of the sale to become informed of those terms. (Zatorski Aff. at 2 ¶ 6.)

Moreover, the Court notes that in Hessel's own exhibits of Christie's current web pages describing the upcoming auctions of the Koons and Basquiat, the "Important Notice" is present in the bottom left-hand corner. (See Ex. 10 to Hessel Aff.)[11] Christie's contends that this same notice was posted on the website prior to the May 2004 auction. (Zatorski Aff. at 2 ¶ 6.) Given that Christie's has been in the business of auctions for quite some time and presumably would want to post a notice of terms and conditions so as to avoid situations like the instant case, it seems unlikely that Hessel would prevail in establishing that such a notice was not posted at the time he visited the website prior to the auction at issue. Moreover, Hessel himself is unclear as to whether the notice was not posted, or whether he just did not see it.[12]

---

11. In fairness to Hessel, the "Important Notice" which, if clicked on, contained the message that the auction was subject to terms and conditions set forth in the catalogue, is at the bottom left-hand corner of the page, which is not immediately visible to the viewer and can only be reached by scrolling down.

12. In his Affirmation in support of his motion for injunctive relief, Hessel alleges that no such terms were posted on Christie's website (Hessel Aff. at 1 ¶ 2); however, in his Complaint, he merely alleges that he did not *see*

any such terms on the website (Compl. at 3 ¶ 9). In the light of this conflict, the Court must credit the version of the facts as pleaded in the complaint. *See Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir.1998) (a party is not entitled to amend its complaint through statements made in motion papers); *Fadem v. Ford Motor Co.* 352 F.Supp.2d 501, 516 (S.D.N.Y.2005) ("It is long-standing precedent in this circuit that parties cannot amend their pleadings through issues raised solely in their briefs.").

■ Regardless, even if the "Important Notice" was not posted on Christie's website in May 2004, ignorance of the terms and conditions of the auction would not relieve Hessel from being bound by them. Under New York law, " '[t]he conditions of a public sale, announced by the auctioneer at the time and place of the sale, are binding on the purchaser, *whether or not he knew or heard them.*' " *Finnish Fur Sales Co. v. Juliette Shulof Furs, Inc.*, 770 F.Supp. 139, 145 (S.D.N.Y.1991) (emphasis added) (quoting *In re Premier Container Corp.*, 95 Misc.2d 859, 408 N.Y.S.2d 725, 730 (N.Y.Sup.1978)). According to *Williston on Contracts*,

> A ... question is[,] the extent to which a bidder is affected by terms of an auction sale of which he is in fact ignorant. The test here is the same as that generally applicable to the formation of contracts; a party is affected by terms which he should reasonably understand to exist or which he should have ascertained, without regard to whether he is in fact aware of them. *Under this principle, a bidder ought to inquire into the terms of an auction sale, and should be bound by those terms if he bids in ignorance of them.*

1 *Williston on Contracts* § 4:9 (Westlaw 2005) (emphasis added). Thus, regardless of whether Christie's informed Hessel of the Conditions of Sale when he telephoned to inquire about bidding, and regardless of whether the terms were posted on the website, Hessel should have inquired about the terms applicable to his bid, instead of assuming that no such terms existed. *See, e.g., Finnish Fur*, 770 F.Supp. at 145 (charging a bidder with knowledge of the conditions of sale in the auction catalogue, despite the bidder's protestations that no one had specifically pointed out to him the provision which the parties were disputing, when the catalogue was made available to the bidder prior to the auction, and the bidder was a "sophisticated defendant ac-customed to bidding at ... auctions"). *Cf. Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir.2004) ("[I]n the absence of fraud or other wrongful act on the part of another contracting party, a party 'who signs or accepts a written contract ... is conclusively presumed to know its contents and to assent to them ....' ") (quoting *Metzger*, 227 N.Y. at 416, 125 N.E. 814); *Sinnett v. Friendly Ice Cream Corp.*, 319 F.Supp.2d 439, 444 (S.D.N.Y. 2004) ("In New York, ... parties are bound 'by the contracts they sign whether or not the party has read the contract so long as there is no fraud, duress or some other wrongful act of the other party." ') (quoting *Tuskey v. Volt Info.*, 2001 WL 873204, at *3 (S.D.N.Y. Aug.3, 2001)).

Hessel has admittedly purchased through Christie's at least ten times before. (*See* Email from Oliver Gelmini to Brett Gorvy, dated Jan. 17, 2005, attached as Ex. 6 to Zatorski Aff. ("Mister Hessel ... has done over 10 purchases from christies [sic] starting nov 1995."); *see also* Email from Oliver Gelmini to Brett Gorvy, dated Nov. 25, 2004, attached as Ex. 8 to Gelmini Aff. ("[T]his is not the first time my client is buying things from you....").). Hessel's extensive experience as a Christie's buyer, and other evidence that he is a sophisticated art purchaser, makes his protestations that he did not know of any of the material terms and conditions of the public auction in which he bid in excess of $2 million less plausible. *Cf. Finnish Fur*, 770 F.Supp. at 145 (bidder could not be heard to complain that "no one specifically pointed out to him" the auction provisions when bidder was a "sophisticated defendant accustomed to bidding at ... auctions").

In addition, the invoices sent to Hessel soon after the auctions stated that "[t]he purchase of property identified on this invoice is subject to the Conditions of Sale

and Limited Warranty set forth in the front of the auction catalogue for the above-referenced sale." (Invoices, attached as Ex. 1 to Hessel Aff.) Thus, at the latest, Hessel was on notice that the Conditions of Sale applied to his purchase when he received his first invoice—no later than June 2004.

Finally, it is doubtful that Christie's, a large and well established auction house, would agree to a contract for artwork worth millions of dollars that contained absolutely no terms concerning time of payment and remedies for breach, but instead just a vague "oral contract" whose terms included only the purchase price.

Because the Court is likely to find that the Conditions of Sale apply to the contract between Hessel and Christie's, Hessel cannot demonstrate a likelihood of success on the merits. These Conditions of Sale state that by bidding at auction the buyer agrees to be bound by its terms. (*See* Conditions of Sale, first para.) Under those terms, Hessel agrees to pay the buyer's premium in addition to the bid price (*See* Conditions of Sale, 4(a)); does not acquire title to the Koons and Basquiat until he has paid in full in good cleared funds (*See* Conditions of Sale, 4(b)); and must pay in full no later than seven days following the sale (*See* Conditions of Sale, 4(b)). Since Hessel has not paid in full, he does not have title to the paintings and is in breach, and under the Conditions of Sale Christie's is entitled to charge reason-

able interest, cancel the sale, and resell the property on such terms as Christie's deems fit. (*See* Conditions of Sale, 4(f)). If Christie's resells, it can also hold Hessel liable for any deficiency, as well as all costs, expenses, damages, legal fees and commissions and premiums associated with both sales or otherwise arising from the default. (*See* Conditions of Sale at 4(f).) Hessel also cannot claim that he owns the Basquiat by virtue of having paid more than its purchase price, because he was in breach for both the Basquiat and the Koons when he did not pay the full balance for either within seven days following the purchase, and for many months thereafter, and under the Conditions of Sale Christie's is allowed in this situation to cross-collateralize the accounts and apply his payments toward either the Koons or the Basquiat. (*See* Conditions of Sale at 4(f)(vii).) Finally, under the Conditions of Sale Christie's can retain the Hirst as collateral for Hessel's obligations. (*See* Conditions of Sale at 4(f)(ix).)

### 2. *Likelihood of Success if the Conditions of Sale Do Not Apply*

Even if the Conditions of Sale do not apply to the contract between Hessel and Christie's, the U.C.C. governs the sale of goods at auction. *See* N.Y. U.C.C. § 2–328 (McKinney's 2005) (Sale by Auction).[13] Under the U.C.C., a sale by auction is complete "when the auctioneer so announces by the fall of the hammer." N.Y. U.C.C. § 2–328.[14] Under the U.C.C.,

---

**13.** Hessel admits that the U.C.C. applies, as he claims that the conduct of the parties established a contract for sale under U.C.C. § 2–207(3). Under § 2–207(3), the terms of the contract consist of those terms on which the writings of the parties agree, "together with any supplementary terms incorporated under any other provisions of this Act." N.Y. U.C.C. § 2–207(3).

**14.** New York law also specifically provides that for goods sold at public auction, the

contract is not required to be in writing as long as the auctioneer, at the time of the sale, enters in a sale book, a memorandum specifying the nature and price of the property sold, the terms of the sale, the name of the purchase, and the name of the person on whose account the sale was made. N.Y. Gen. Oblig. Law § 5–701 (McKinney 2005). Although Christie's points this out in its Memorandum of Law (*see* Def. Mem. at 13), it does not explicitly state that its auctioneer followed these procedures.

"[w]here the buyer ... fails to make a payment due on or before delivery, ... then with respect to any goods directly affected and, if the breach is of the whole contract ..., then also with respect to the whole undelivered balance, the aggrieved seller may ... (d) resell and recover damages as hereafter provided (Section 2–706); ... [or] (f) cancel." N.Y. U.C.C. § 2–703. Even if Hessel were correct that the parties' agreement contained no term for time of payment,[15] the court may imply a time term into the contract. *See Jafari v. Wally Findlay Galleries*, 741 F.Supp. 64, 67 (S.D.N.Y.1990) ("Although this contract [for sale of a painting] did not specify the payment and delivery dates, we can imply the time term into the contract."). Under U.C.C. § 2–309(1), "[t]he time for shipment or delivery or any other action under a contract if not ... agreed upon shall be a reasonable time." N.Y. U.C.C. § 2–309(1); *see Jafari*, 741 F.Supp. at 67. Because the Conditions of Sale, which generally govern all auctions at Christie's, require full payment within seven calendar days after the sale (*see* Conditions of Sale, 4(b)), and because Hessel has presented no evidence that delaying full payment of an auction purchase for eighteen months or longer is reasonable, the Court finds that a payment time of eighteen months or longer after the auction is not reasonable and is not part of the contract between Hessel and Christie's. *See* N.Y. U.C.C. § 2–309 Official Cmt. ("The reasonable time under this provision ... depends upon what constitutes acceptable commercial conduct in view of the nature, purpose and circumstances of the action to be taken. Agree-

ment as to a definite time, however, may be found in a term implied from the contractual circumstances, usage of trade or course of dealing or performance...."). Thus, even without the Conditions of Sale, Hessel is in breach and under U.C.C. § 2–703, Christie's may cancel the sale to Hessel and resell the Koons and Basquiat at auction. Moreover, under U.C.C. § 2–706, Christie's is not accountable to Hessel for any profit made on any resale. N.Y. U.C.C. § 2–706(6).

### 3. Whether The Conditions of Sale Were Modified or Waived

■ Hessel also argues that in addition to his partial payments of $1,198,750, he delivered another painting, the Hirst, as further assurance of performance in exchange for Christie's granting him additional time to make full payment and in exchange for Christie's agreeing to reduce his interest rate. (Pl. Mem. at 3.) He thus seems to be arguing that Christie's agreed to modify or waive certain terms of the contract. Christie's did demand the Hirst and the $500,000. (*See* Zatorski Aff. at 4 ¶ 12.) Christie's had demanded *both* the Hirst *and* $500,000. (*See id.;* Oct. 29, 2004 Email, attached as Ex. 8 to Zatorski Aff.) However, Christie's did not receive the $500,000. (*See* Email Correspondence between Brett Gorvy and Oliver Gelmini, dated Nov. 22–24, 2004, attached as Ex. 9 to Hessel Aff.) Thus, Christie's was not obligated to grant Hessel additional time before selling the Koons.[16] Furthermore, Christie's discussed the Hirst and the $500,000 as an exchange for Christie's re-

---

**15.** *See, e.g.,* Hessel Aff. at 2 ¶ 3 (stating that he "did not consider issues such as the timing of my payment"); Hessel Aff. at 9 ¶¶ 29–30 ("There are no written agreements signed by the parties reflecting their intentions.... [N]o documents were ever exchanged ... detailing any terms of the contract, other than

the purchase price, and the artwork that was being purchased.").

**16.** Moreover, Hessel explicitly consented to the Koons sale. (*See* Email Correspondence between Brett Gorvy and Oliver Gelmini, dated Nov. 22–24, 2004, attached as Ex. 9 to Hessel Aff.)

fraining from exercising its rights under the contract to sell the paintings—Christie's did not state that it would lower the interest rate upon receipt of the Hirst and the $500,000. (*See* Oct. 29, 2004 Email, attached as Ex. 8 to Zatorski Aff.). Hessel has not provided any evidence that Christie's at any time agreed to reduce its interest rate. Although Hessel "assumed" that Christie's had agreed to lower its interest rates (*See* Hessel Aff. at 6 ¶¶ 17–18; Compl. at 8 ¶ 31.), he provides no evidence that Christie's did so agree. Thus, Hessel is unlikely to be able to show that Christie's modified the contract.

Nor is there any evidence that Christie's waived its rights under the contract. In fact, in its January 3 and February 25, 2005 letters to Hessel, Christie's explicitly reserved its rights. (*See* Letter to Carl Hessel from Christie's, dated Jan. 3, 2005, attached as Ex. 10 to Zatorski Aff.; Letter to Carl Hessel from Christie's, dated Feb. 25, 2005, attached as Ex. 11 to Zatorski Aff.) Although Christie's does not point to any earlier communication in which it reserved its rights, these letters could serve as a retraction of any such waiver. *See* N.Y. U.C.C. § 2–209(5) ("A party who has made a waiver affecting an executory portion of the contract may retract the waiver by reasonable notification received by the other party that strict performance will be required of any term waived . . . ."). Thus, Hessel also is unlikely to be able to show that Christie's waived its rights under the contract.

## D. *IRREPARABLE HARM*

Plaintiffs must prove that they will be irreparably harmed by the denial of preliminary injunctive relief before they can claim entitlement to a preliminary injunction. In the Second Circuit, "[p]erhaps the single most important prerequisite for the issuance of a preliminary injunction is a demonstration that if it is not granted the applicant is likely to suffer irreparable harm before a decision on the merits can be rendered." *Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (2d Cir. 1983)).

█  Hessel argues that he will be irreparably harmed if Christie's sells the Koons and Basquiat at auction, because "no monetary award could adequately compensate [him] for the loss of such unique original pieces that cannot be replaced or duplicated." (Pl. Mem. at 6.) It is true, as Hessel notes, that "[t]he very nature of original fine art such as the Koons and Basquiat paintings make them unique in the world." (Pl. Mem. at 6.) It is also true, as Hessel notes, that if Christie's is not enjoined from selling the paintings, that he "will certainly lose the Koons and Basquiat paintings forever and may lose his Hirst." (Pl. Mem. at 6.) However, Hessel has not sufficiently demonstrated that the Koons and Basquiat are his to lose. Although he insists that he is the "owner" of these paintings, as discussed *supra,* Hessel's claims to these paintings are doubtful at best. Under the Conditions of Sale, which the Court likely will find apply to Hessel's contract, title does not pass until payment in full has been made. (*See* Conditions of Sale, 4(b)). At oral argument, Christie's represented that it did not intend to auction the Hirst at this time. In addition, by Hessel's own admission, the Koons has a fair market value of $2,000,000, the Basquiat has a fair market value of $500,000, and the Hirst has a fair market value of $700,000. (*See* Affirmation of Elin Lake Ewald, dated Oct. 31, 2005, at 2 ¶¶ 6–8.) Thus, in the event that the Court ultimately found in Hessel's favor, there is a quantifiable dollar amount that he can recover. Dashing Hessel's hope to own paintings that he does not actually own does not constitute irreparable harm. *Cf. Blue Lo-*

*tus Holdings Ltd. v. United States,* No. 96 Cv. 233, 1996 WL 679758, at *2 (N.D.N.Y. Oct.22, 1996) ("The property is not Mr. Daunay's property and his subjective feelings about its uniqueness or beauty are not entitled to any weight.").

### E. *SUFFICIENTLY SERIOUS QUESTIONS AND BALANCE OF HARDSHIPS*

■ Hessel argues that the balance of hardships tips decidedly toward him because he "stands to lose irreplaceable and unique pieces of artwork if the injunction is not issued," while Christie's "would suffer absolutely no hardship if the injunction is issued." (Pl. Mem. at 7.). He argues that since Christie's has in its possession the Koons, Basquiat and Hirst, which are collectively worth at least $3.25 million (by Hessel's estimate), but is owed no more than $1,472,062.72 (by Christie's estimate), Christie's will not suffer any damages if this Court grants an injunction. (*See id.*)

However, Christie's will suffer some hardship if it is forced to withdraw the Koons and Basquiat from the auction. First, it has already advertised and marketed the auctions as including the Koons and Basquiat paintings, including distributing thousands of catalogues containing descriptions of these works in early October 2005. (Zatorski Decl. at 7 ¶¶ 24–25; Def. Mem. at 18.) If Christie's must withdraw the paintings by reason of an injunction, prospective bidders, including some who may have already traveled to New York to bid, may be inconvenienced, and Christie's reputation may be affected as a result. (*See* Zatorski Decl. at 7 ¶¶ 26–27; Def. Mem. at 18.). Second, Christie's has been without the benefit of the money it has been owed for many months, and while it may be able to recover this money in the March 2006 auction as Hessel proposes, there is no guarantee that it will be able to do so, since future conditions in the art market cannot be predicted with certainty.

Although these hardships may not be severe, it is not accurate to conclude that Christie's would suffer no hardship.

Moreover, if Hessel is charged with knowledge of the Conditions of Sale, as the Court is likely to do under applicable New York law, he would be aware, especially as a sophisticated art purchaser at auctions, that failure of a successful bidder to pay for the auctioned goods within a specified time after the sale entitles the auctioneer to resell the property. In addition, in this case Hessel actually knew on September 2, 2005 that the paintings would be offered for sale on November 8 and 9. (*See* Hessel Aff. at 7 ¶ 21; Email from Jennifer Zatorski to Oliver Gelmini, dated Sept. 2, 2005, attached as Ex. 9 to Hessel Aff.). He was again warned on September 19 that the paintings would be offered for sale unless payment in full was made by September 23, 2005. (*See* Letter from Lee White Galvis, Deputy General Counsel at Christie's, to Dagon, dated Sept. 19, 2005, attached as Ex. 16 to Zatorski Aff.). Yet Hessel did not bring an Order to Show Cause until November 1, 2005—one week before the auction was to commence and three days before public viewing began of the artwork to be sold. (*See* Zatorski Aff. at 8 ¶ 28.) "A party's delay in moving for preliminary injunctive relief undercuts the sense of urgency that typically accompanies such a motion[.]" *Transperfect Translations Int'l, Inc. v. Merrill Corp.,* No. 03 Civ. 10146, 2004 WL 2725032, at *4 (S.D.N.Y. Nov.30, 2004). *Cf. Walt Disney Prods. v. Basmajian,* 600 F.Supp. 439, 442 (S.D.N.Y.1984) (finding that balance of equities tipped in Christie's favor when party seeking to stop auction had opportunity to move a few months earlier to seek injunctive relief but instead waited until a few days before the scheduled auction, while Christie's "ha[d] expended funds and effort in promoting [the] auction"). Since Christie's will suffer some hardship, and

there is no reason that Hessel could not have made this application two months ago, the balance of hardships does not tip decisively in his favor.

## III. *ORDER*

For the reasons described above, it is hereby

**ORDERED** that the Order dated November 7, 2005 stating the Court's ruling from the bench following oral argument on the motion of plaintiff Carl M. Hessel ("Hessel") for a preliminary injunction is amended to incorporate the discussion set forth above; and it is further

**ORDERED** that Hessel's motion herein is denied; and it is finally

**ORDERED** that the parties confer and submit to the Court by November 21, 2005 a proposed Case Management Plan agreed upon to govern remaining pretrial proceedings in this action.

**SO ORDERED.**